[1] This defendant's case in the Court of Criminal Appeals was styledAnnanias Hill v. State. See 546 So.2d 401 and 550 So.2d 1089.
This Court issued the writ of certiorari to review the petitioner's conviction of murder. That conviction was affirmed by the Court of Criminal Appeals without opinion.
Anninias Hill was convicted of the murder of Barbara Muse. Hill contends, inter alia, that an extrajudicial statement he made to officers of the Birmingham Police Department was involuntary and should have been suppressed. He maintains that his statement was involuntary for three reasons: First, because he was emotionally distraught when he gave the statement; second, because he is borderline mentally retarded and has other psychological or mental defects; and third, because the police used trickery to obtain the statement.
Two days after Muse's body was discovered, Hill was told to come to the police station to answer some questions. He was interrogated by Sergeants Reynolds and Duncan from 3:45 p.m. until 7:45 p.m. That interrogation was not tape-recorded, and no handwritten notes were made after the initial stages of the interrogation. Sgt. Reynolds testified at the suppression hearing that he stopped taking notes because the note-taking made Hill hesitant to speak, and that he made a "judgment call" not to tape-record the interrogation. At the suppression hearing, Reynolds denied that his decision not to record Hill's interrogation was based on Hill's emotional condition. However, Hill's attorney confronted Reynolds with testimony he had given earlier at a preliminary hearing:
"The Court: Was all of the interview on tape?
 "Reynolds: No sir; we were not able to tape the interview. The reason that I didn't is because of the emotional condition of Mr. Hill. We did not have a written statement either."
Reynolds also testified at the hearing that Hill was either upset, crying, sobbing, or whimpering throughout the interrogation.
Throughout the first three and one-half hours of the interrogation, Hill consistently refused to make an incriminating statement. During that part of the interrogation, Sergeants Reynolds and Duncan repeatedly told Hill that they possessed certain incriminating evidence, although that evidence did not, in fact, exist. The following testimony was elicited from Sgt. Reynolds:
 "Q. [Mr. Jaffee] Now, during the course of these first three and a half hours, up until 7:15, you had told him three different times that his fingerprints were on this lady's neck, that the coroner had told you that, that was in the coroner's report?
 "A. [Sergeant Reynolds] No sir; I didn't tell him it was in the coroner's report.
 "Q. But you told him that you spoke to the coroner, you had the coroner's report.
 "A. Yes, sir; but the two were not related as you just grouped them together.
 "Q. But you did tell him that: Look, we've got the coroner's report, we've got *Page 840 
a statement from a witness saying he saw someone dragging a body, dragging a body into the laundromat around early that morning, and your fingerprints were found on her neck?
"A. Yes, sir.
". . . .
 "Q. It's certainly a fair statement to say you told him at least twice, maybe three times before 7:15?
"A. Yes, sir.
 "Q. Now, of course, that wasn't true? His fingerprints were not, in fact, found on her neck?
"A. That's correct."
At some time after being confronted with this fictional evidence, Hill made a statement to the police. Although the substance of that statement was incriminating, he did not confess to the murder of Muse. In fact, he continued to insist that Ms. Muse was alive when he last saw her, and even denied that she was dead at the time he was giving his statement. According to Sgt. Reynolds, the last thing Hill shouted before the interrogation was concluded was:
 "Bobbie [Ms. Muse] ain't dead. Bobbie ain't dead. There. Bobbie ain't dead."
Following the interrogation, Sgt. Reynolds wrote down Hill's statement. He testified that he did so without referring to any notes and without consulting Sgt. Duncan. Instead, Reynolds said he relied only on his memory. Reynolds's version of Hill's statement was never read to Hill or gone over with him to verify its accuracy, and there is no indication that it was ever signed by Hill.
Following the suppression hearing, the trial judge ruled that the statement was admissible. Although the State never attempted to have the statement formally entered into evidence, Sgt. Reynolds, referring to notes, read the entire statement to the jury during the State's case-in-chief. The question that this Court must resolve is whether, in light of the totality of the circumstances surrounding the procurement of Hill's statement, the trial court could properly determine that it was voluntary.
Before trial, Hill underwent psychological testing, which indicated that he was borderline mentally retarded and suffered from either a schizophrenic personality or a schizoid personality disorder. The psychologist that conducted those tests, Dr. Allen Shealy, testified at the suppression hearing. Dr. Shealy stated that he suspected that Hill also had some brain damage as a result of an earlier head trauma. He also testified that Hill was depressed and griefstricken due to Muse's death. Dr. Shealy stated that the combination of these factors caused Hill to be out of touch with reality at the time of his interrogation, and probably prevented him from understanding the significance of his Miranda rights and the consequences of waiving those rights.
Dr. William Beidleman, a licensed psychologist, examined Hill a number of times and testified at his trial. He stated that Hill was borderline mentally retarded, suffered from an organic personality syndrome as a result of head trauma, and suffered from a mixed personality disorder with schizoid and dependent features. Dr. Beidleman testified that those defects would affect Hill's emotional state and limit his ability to cope with stressful situations.
Although Hill's statement was not a confession, it is well settled that an inculpatory statement directly relating to the facts or circumstances of a crime and connecting the defendant therewith is subject to the same rules of admissibility as direct confessions. Holt v. State, 372 So.2d 364, 369
(Ala.Cr.App. 1977), rev'd on other grounds, 372 So.2d 370 (Ala. 1978), (citing MeGehee v. State, 171 Ala. 19, 55 So. 159
(1911)). The law concerning the admissibility of extrajudicial confessions in Alabama is clearly expressed in Eakes v. State,387 So.2d 855, 858-59 (Ala.Cr.App. 1978):
 "A confession is presumed to be involuntary. Before its admission into evidence there must be evidence addressed to the trial judge sufficient to rebut that presumption and a showing that the confession was made without influence of either hope or fear, unless the attending *Page 841 
circumstances affirmatively disclose the voluntariness of the confession. Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973); Bush v. State, 282 Ala. 134, 209 So.2d 416 (1968). In order to be admissible a confession must be free and voluntary and cannot be the result of any direct or implied promises, however slight. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Shotwell Mfg. Co. v. United States, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); Bell v. Alabama, 5 Cir., 367 F.2d 243, cert. denied, 386 U.S. 916, 87 S.Ct. 859, 17 L.Ed.2d 788 (1966); Wallace, supra. The question of whether a confession was obtained by coercion or improper inducement can be determined only by examination of all the attendant circumstances. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Wallace, supra.
Each case must stand or fall on its own merits for the constitutional inquiry into the issue of voluntariness requires more than a mere 'color-matching of cases.' Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). The true test of determining whether extrajudicial confessions are involuntary is whether the defendant's will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770
(1963); Elliot v. State, 338 So.2d 483 (Ala.Cr.App. 1976)."
This Court has long recognized that confessions or statements obtained by violence, or threats of violence, are per se involuntary and therefore inadmissible. Redd v. State, 69 Ala. 255
(1881). Other direct means of inducing confessions involving psychological, rather than physical, manipulation, such as offers of benefits, rewards, or immunity have also been held to be unconstitutional. See, e.g., Spano v. New York,360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Watts v.Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949);Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921,88 L.Ed. 1192 (1944). The use of those techniques has led courts to deem the resulting confessions to be coerced, and therefore in violation of the defendant's Fifth and Sixth Amendment rights.See, e.g., Spano, 360 U.S. at 323-24, 79 S.Ct. at 1207-08,3 L.Ed.2d at 1271-72; Watts, 338 U.S. at 53-55,69 S.Ct. at 1349-50, 93 L.Ed. at 1806-07; Ashcraft, 322 U.S. at 153-54,64 S.Ct. at 926, 88 L.Ed. at 1199. However, more subtle forms of psychological manipulation, such as trickery or deception by the police, have not been considered sufficiently coercive, standing alone, to render a confession or incriminating statement involuntary. Instead, the trial judge must examine the totality of the circumstances surrounding the statement to determine its voluntariness. Frazier v. Cupp, 394 U.S. 731,89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).
Confessions or statements that result from improper inducements have been held inadmissible for two reasons. First, such statements have traditionally been excluded because of their inherent unreliability. Elmore v. State, 223 Ala. 490,137 So. 185 (1931). That theory of exclusion stemmed more from a concern with testimonial trust-worthiness than with the rights of the accused. See, 3 Wigmore, Evidence, § 822 (Chadbourn rev. 1970). The second, more modern theory of exclusion is based on the guarantees of the due process clause. Writing for the majority of the United States Supreme Court inRogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760
(1961), Justice Frankfurter eloquently stated the rationale for excluding coerced confessions:
 "[C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is not so because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system — a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." (Citations omitted.)
Rogers, 365 U.S. at 540-41, 81 S.Ct. at 739-40,5 L.Ed.2d at 766-67. As the Court *Page 842 
stated in Jackson v. Denno, 378 U.S. 368, 376, 84 S.Ct. 1774,1780, 12 L.Ed.2d 908, 915 (1964): "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, [citation omitted] and even though there is ample evidence aside from the confession to support the conviction."
After an examination of the totality of the circumstances surrounding Hill's interrogation and statement, this Court is led to the conclusion that Hill's will was overborne at the time he made the statement and that the statement was therefore not the product of a rational intellect and a free will. Instead, the statement was the result, in large part, of a deliberate deception perpetrated upon a person of weak intellect who was emotionally distraught. The important factors in our determination are the evidence of Hill's borderline mental retardation, his schizophrenic personality or schizoid personality disorder, the evidence of possible brain damage, and Hill's emotional state at the time of the interrogation, coupled with the police officers' deception. This Court finds the use of such blatant deceptions by the police to be at odds with our concept of due process of law, and especially repugnant when used against suspects of diminished intellectual ability. Because Hill's statement was not voluntary, it should have been suppressed by the trial judge. As a result of the trial judge's failure to suppress the statement, Sgt. Reynolds was allowed to read that statement to the jury, depriving Hill of his right to a fair trial. Therefore, the Court of Criminal Appeals' judgment is reversed, and this case is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, JONES, ALMON, SHORES, ADAMS, and KENNEDY, JJ., concur.