The appellant was convicted of the capital crime of intentional murder committed during a robbery or attempted robbery. Following a sentencing hearing, the jury recommended that the appellant be sentenced to life without parole, by a vote of *Page 890 
12 to 0. Thereafter, the trial court sentenced the appellant to life imprisonment without parole.
The appellant argues that the trial court improperly allowed a taped statement and a confession, as well as testimony concerning the statement and the confession, into evidence, because, he says, they were not voluntarily made. Specifically, he argues that his statement and confession were involuntary because, he says, he had a low mentality, he was emotionally distraught when he gave them, and the police used improper methods of coercion in obtaining them.
During the suppression hearing, the appellant presented the testimony of a psychologist who had examined the appellant; that witness testified that he determined that the appellant had a full scale intelligence quotient of 78, placing him in a range of borderline intelligence. He scored significantly higher on the performance part than on the verbal part of the test. The witness further testified that the appellant was "not a psychotic individual, and that there was no evidence at all . . . of any serious mental illness." He testified that the appellant's educational functioning was that of a third grader, a child seven or eight years old. He further stated that the M.M.P.I. test revealed the appellant to be someone "low in self-esteem," "prone to substance abuse," "trusting in others," and "a rather frightened individual in general".
 "It is well settled that the mere fact that a defendant is functionally illiterate or simple-minded will not vitiate the voluntariness of his confession. Cliff v. State, 518 So.2d 786
(Ala.Cr.App. 1987). The low mentality of a defendant should go to the weight and credibility of the confession rather than to its admissibility. Elrod v. State, 281 Ala. 331, 202 So.2d 539 (1967). A defendant's mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. Whittle v. State, 518 So.2d 793
(Ala.Cr.App. 1987); Sasser v. State, 497 So.2d 1131
(Ala.Cr.App. 1986). See generally, Annot. 8 A.L.R. 4th 16 (1981)."
Lewis v. State, 535 So.2d 228, 235 (Ala.Cr.App. 1988). Thus, the evidence presented by the appellant concerning his low mentality was only a matter to be considered in determining what weight or credibility should be given to the confession.
Although the appellant argues that he was emotionally distraught at the time he made his statement, we note that " '[m]ere emotionalism and confusion do not dictate a finding of mental incompetency or insanity.' Sullivan v. Alabama,666 F.2d 478, 483 (11th Cir. 1982)." Murphy v. State, 462 So.2d 761,762 (Ala.Cr.App. 1984).
The appellant argues that a police officer used certain coercive and deceptive activities to obtain his confession. Gerald Goodwin, of the Morgan County Sheriff's Department, began a reinvestigation into a shooting death that had occurred in 1984. Pursuant to some information he had received, he spoke to the appellant's probation officer. Thereafter, he picked up the appellant in order to take him to the probation officer, who had indicated that he also wished to speak to the appellant. Officer Goodwin testified that he advised the appellant of his rights, and the appellant signed a waiver. The appellant was then interviewed by his probation officer and Officer Goodwin; the interview was taped. During the interview, the appellant gave several different versions of his involvement in the incident, eventually confessing that he was involved in the offense, but denying that he actually pulled the trigger or took the victim's wallet. Officer Goodwin wrote out a summary of the appellant's final version, read the statement to the appellant, and allowed him to read it. The appellant then signed the statement. The entire taped conversation with the appellant was thereafter transcribed. Three days later, the appellant was given a polygraph test. After being told the results of his test, the appellant gave Officer Goodwin a signed statement, admitting to shooting the victim once or twice.
When questioned on cross-examination concerning the first taped conversation with the appellant, Officer Goodwin admitted that during the course of that interview, *Page 891 
he told the appellant that a capital murder charge would not "stay" on him; that he told the appellant that the police had identified fingerprints from the victim's billfold, which was not true; and that the police had spoken to two eyewitnesses to the offense, who stated that the appellant was there, which was also untrue. The appellant argues that because of this deliberate deception during the first interview, his first statement and subsequent confession were involuntary.
The following transpired during the cross-examination of Officer Goodwin:
 "Q: What else did you tell him [the appellant] that was not true?
"A: I told him I had a witness.
 "Q: As a matter of fact, you told him immediately after the tape started running and immediately after you gave him his rights that you had two eyewitnesses, didn't you?
"A: Yes, sir.
 "Q: Was your statement something to the effect that 'I've got two eyewitnesses to it that saw you there'?
"A: Yes, sir.
"Q: That was not true, was it?
"A: That's correct.
 "Q: As a matter of fact, that was entirely false, wasn't it?
"A: I had two witnesses but not eyewitnesses.
 "Q: You didn't have any witness to the — you didn't have any witness to the shooting of Billy Hough [the victim]?
"A: Just one.
"Q: Who was that?
"A: Co-defendant.
 "Q: You hadn't interviewed him at that time, had you?
"A: Not at that time.
 "Q: You didn't know what Gary — you are talking about Gary Wayne Davis, aren't you?
"A: Yes, sir.
 "Q: You didn't know what Gary Wayne Davidson was going to say, did you?
"A: Not really.
"Q: You hadn't talked to him?
"A: No, sir.
 "Q: So you didn't have any eyewitnesses. You said earlier you had one. You didn't have any eyewitnesses at all, did you?
"A: Not then, I didn't.
"Q: But you told Rickey you did?
"A: Yes, sir.
"Q: Did you tell him that you had fingerprints?
"A: I don't remember.
 "Q: Mr. Goodwin, I'm going to refer to what is page eleven of the transcript that's been provided the court and ask you if you made this statement to Rickey or is this a true and accurate rendition of what you said: 'Yeah, well, it was found off in the ditch. It was found two years ago, and there is fingerprints on it.'
"A: Yes, sir; I did.
 "Q: But you didn't have anything with fingerprints on it, did you?
 "A: I had sent the billfold to the lab. I didn't have the results. I sent it shortly after.
 "Q: There have never been any fingerprints identified on any billfold, have they?
 "A: They found nothing on anything in the billfold.
 "Q: Now, did you ever tell him that he was not going to be charged with capital murder?
 "A: I told him I was not going to charge him with capital murder. I didn't know what the grand jury would do.
 "Q: Did you ever tell him that capital murder wouldn't stay on him?
"A: I think it was about his involvement in it.
 "Q: I asked you, 'Did you ever tell him capital murder wouldn't stay on him?'
"A: Yes, sir; I said that.
 "Q: That was the statement you made to him prior to his ever making any statement about being at the Wavaho station where Billy Hough got shot, wasn't it?
"A: Yes, sir.
 "Q: I'm going to show you what appears at the very top of page three of the transcript before the court at this time. And I'll ask you did you say this: 'But *Page 892 
capital murder won't stay on you, I know that.'?
"A: Yes, sir.
 "Q: You made that statement to Mr. Prince before he had ever admitted being at the Wavaho station?
"A: Yes, sir.
 "Q: As a matter of fact, he had, in fact, denied being at the Wavaho station prior to you saying that, didn't he?
"A: Yes, sir.
 "Q: But you knew at the time you made the statement to Rickey you were investigating what you consider to be a capital murder, weren't you; that's what you told us earlier?
"A: Yes, sir."
The record contains a transcribed version of the taped conversation between Officer Goodwin and the appellant. This transcript reveals that Officer Goodwin initially told the appellant that he had spoken to two eyewitnesses who stated that they had seen the appellant at the scene of the offense. He further told the appellant that he had spoken to the two alleged accomplices and that they both indicated that the appellant committed the offense and that they wanted the appellant "to get hung on it." The appellant responded by indicating that the other two committed the offense and took his gun; however, he began to reveal what transpired during the offense. Officer Goodwin responded by stating:
 "You were there though. I can tell by the way you are looking, you were there. I don't think you shot him. That's why I want, I told you it was serious, but there is a way we can work around it. You can't — you are not going to get free of it. I'll tell you that. But capital murder won't stay on you. I know that. But I know you were there."
The appellant then admitted having been present at the scene of the offense, but denied taking the victim's wallet or shooting him. Officer Goodwin subsequently told the appellant that, depending on the nature of his involvement, he might be charged with capital murder. Officer Goodwin told the appellant that the victim's billfold was found previously and had fingerprints on it. The appellant responded by stating that none of the fingerprints could have been his, because he never touched the billfold. He stated, "Yeah, we pulled it out," but he denied ever having touched the billfold. The appellant then asked Officer Goodwin, "What all has Gary [the accomplice] told you?" Officer Goodwin responded that the accomplice was "trying to insinuate he didn't know anything about it" and that the appellant "was the one that went down there, did the man to get money to buy coke." The appellant then gave further details indicating that he was present, but that his accomplice committed the offense.
The appellant was allowed to leave, following his statement, but was asked to return three days later to take a polygraph test. The appellant returned as instructed and took the polygraph test; when told the results of the test, Officer Goodwin placed his hands on the appellant's shoulder and stated that he knew that the appellant had not committed the offense but that the "dope fiend" inside of him had done it. The appellant began crying and confessed to having committed the offense. During the trial, the psychologist testified that an individual with the personality type of the appellant, who was told by law enforcement officers during an interview that capital murder would not "stay" on him, might act pursuant to such an inducement three days later.
Because of the circumstances surrounding the giving of both of the appellant's statements, we hold that these statements were involuntarily given and were inadmissible. Specifically, the statement made by the interrogating officer to the appellant that he "knew" that capital murder would not "stay" on him constituted an improper inducement or promise; and the false statements made by the officer concerning the eyewitnesses, the statements by the accomplices indicating that the appellant committed the offense, and the false fingerprint evidence constituted "affirmative misrepresentations" that caused the appellant's statement given immediately thereafter connecting him to the offense *Page 893 
to be involuntary. Moreover, because of the testimony concerning the appellant's limited intellectual functioning, we cannot conclude that the three-day interval was a sufficient intervening period to negate the effect of the officer's previous actions, especially where the polygraph test was taken pursuant to the police officers' instructions.
 "The law with regard to the admissibility of a confession is aptly stated in Eakes v. State, 387 So.2d 855 (Ala.Cr.App. 1978);
 " 'A confession is presumed to be involuntary. Before its admission into evidence there must be evidence addressed to the trial judge sufficient to rebut that presumption and a showing that the confession was made without influence of either hope or . . . fear, unless the attending circumstances affirmatively disclose the voluntariness of the confession. Wallace v. State, 290 Ala. 201, 275 So.2d 634
(1973); Bush v. State, 282 Ala. 134, 209 So.2d 416 (1968). In order to be admissible a confession must be free and voluntary and cannot be the result of any direct or implied promises, however slight. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Shotwell Mfg. Co. v. United States, 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); Bell v. Alabama, 5 Cir., 367 F.2d 243, cert. denied, 386 U.S. 916, 87 S.Ct. 859, 17 L.Ed.2d 788 (1967); Wallace, supra. The question of whether a confession was obtained by coercion or improper inducement can be determined only by examination of all the attendant circumstances. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Wallace, supra. Each case must stand or fall on its own merits for the constitutional inquiry into the issue of voluntariness requires more than a mere "color-matching of cases." Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). The true test of determining whether extrajudicial confessions are voluntary is whether the defendant's will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Elliott v. State, 338 So.2d 483 (Ala.Cr.App. 1976).'
 "Before a confession can be admitted, the trial court must be satisfied by a preponderance of the evidence that it was voluntarily made. This finding will not be disturbed on appeal, unless it is evident that the determination was palpably contrary to the weight of the evidence. Ex parte Singleton, 465 So.2d 443 (Ala. 1985)."
Ex parte McCary, 528 So.2d 1133, 1134 (Ala. 1988).
In Ex parte Johnson, 522 So.2d 234 (Ala. 1988), the Alabama Supreme Court addressed a situation in which a defendant was told during an interview by a Tennessee state trooper, that he was being asked questions concerning his involvement in an offense which occurred in Alabama, "strictly" in order to investigate a traffic accident in Tennessee and that the defendant's responses would not be used against him in any other criminal proceeding. Thereafter, the information was passed on to the Alabama authorities and was used to secure the appellant's convictions as to that offense. The Alabama Supreme Court, pursuant to a totality-of-the-circumstances analysis, determined that, "[f]rom our examination of the attendant circumstances, we find ample evidence that [the defendant's] statement was deceptively induced." Id. at 237.
In Ex parte Weeks, 531 So.2d 643 (Ala. 1988), the Alabama Supreme Court determined that a statement made by an interrogating officer to the defendant that the officer "wanted his [the defendant's] cooperation in this matter" and that if the defendant confessed to his role on the burglary the officer "would make it known to the district attorney," was held to be an improper offer to elicit the inculpatory statement. In holding that this improper inducement presented a finding of voluntariness, the Court cited Womack v. State, 281 Ala. 499,205 So.2d 579 (1967), stating: *Page 894 
 "Womack was a murder case in which the defendant was told it would 'go lighter' on him if he talked. 281 Ala. at 506, 205 So.2d at 585. In reversing his conviction, this Court held that the sheriff's inducement gave the defendant a 'real hope for lighter punishment' and therefore made his admission involuntary. See also Edwardson v. State, 255 Ala. 246, 51 So.2d 233 (1951); Kelly v. State, 72 Ala. 244 (1882); Redd v. State, 69 Ala. 255
(1881). As this Court said in Womack:
 " 'Any words spoken in the hearing of the prisoner which may, in their nature, generate such fear or hope, render it not only proper but necessary that confessions made within a reasonable time afterwards shall be excluded, unless it is shown by clear and full proof that the confession was voluntarily made after all trace of hope or fear had been fully withdrawn or explained away and the mind of the prisoner made as free from bias or intimidation as if no attempt had ever been made to obtain such confessions.'
 Owen v. State, 78 Ala. 425, 428 (1885). See also Ex parte Callahan, 471 So.2d 463, 464 (Ala. 1985)."
Id. at 644.
In the present case, the officer's statement that things could be worked out and that he knew that a capital murder charge would not "stay" on the appellant, by its nature, could have generated such a hope in the appellant that he may have been improperly induced to make his statement. The officer did subsequently state that the appellant could be charged with capital murder; nevertheless, because of the other attendant circumstances, including the appellant's limited mental capacity,[1] we cannot conclude that all trace of hope was fully withdrawn or explained away from the appellant's mind.
In Ex parte Hill, 557 So.2d 838 (Ala. 1989), the Alabama Supreme Court concluded that the admission of the defendant's statement, although not a confession, was improper because it resulted from certain trickery or deception by the police. InEx parte Hill, supra, during the course of interrogating the defendant, an officer told the defendant that he had a statement from a witness who indicated that he had seen someone dragging a body into the laundromat early on the morning in question and that the defendant's fingerprints were found on the victim's neck. The Court noted that "[a]t some time after being confronted with this fictional evidence, [the defendant] made a statement to the police." Furthermore, the defendant's statement was incriminating, but he did not confess to the murder; in fact, he continued to insist that the victim was still alive when he last saw her. Id. at 840. The Court held that although the defendant's statement was not a confession, it was an inculpatory statement directly relating to the facts or circumstances of the crime and connecting the defendant thereto. Id. In determining that the defendant's statement was involuntary, the Alabama Supreme Court noted that certain forms of psychological manipulation, such as offers of rewards, immunity, or benefits, had been held unconstitutional; however, "more subtle forms of psychological manipulation, such as trickery or deception by the police, have not been considered sufficiently coercive, standing alone, to render a confession or incriminating statement involuntary." Id. at 841. "Instead, the trial judge must examine the totality of the circumstances surrounding the statement to determine its voluntariness." Id.
The Court concluded:
 "[T]his Court is led to the conclusion that [the defendant's] will was overborne at the time he made the statement and . . . the statement was therefore not the product of a rational intellect and a free will. Instead, the statement was the result, in large part, of a deliberate deception perpetrated upon a person of weak intellect who was emotionally distraught. The important factors in our determination are the evidence of [the defendant's] borderline mental retardation, his schizophrenic *Page 895 
personality or schizoid personality disorder, the evidence of possible brain damage, and [the defendant's] emotional state at the time of the interrogation, coupled with the police officers' deception. This Court finds the use of such blatant deceptions by the police to be at odds with our concept of due process of law, and especially repugnant when used against suspects of diminished intellectual ability."
Id. at 842.[2]
Similarly, in Ex parte McCary, 528 So.2d 1133 (Ala. 1988), the Alabama Supreme Court determined that "an affirmative misrepresentation" made to the defendant[3] resulted in a violation of the defendant's right to due process and, thus, that the defendant's statement should have been held inadmissible as involuntary. After being told of the false information, the defendant in McCary denied the killing, "but apparently confessed at some point during the interrogation after the misrepresentation had been made." Id. at 1134. The Alabama Supreme Court quoted Spano v. New York, 360 U.S. 315,79 S.Ct. 1202, 1203, 3 L.Ed.2d 1265 (1959), stating, " 'We are forced to resolve a conflict between two fundamental interests of society; its interest in prompt and efficient law enforcement, and its interest in preventing the rights of its individual members from being abridged by unconstitutional methods of law enforcement.' " Id. at 1135.
Therefore, based on the above cited authority and in light of the circumstances attending the appellant's statements, we conclude that the State's evidence was not sufficient to rebut the presumption of involuntariness. Therefore, the conviction is due to be reversed and the cause remanded to the trial court for a new trial.
REVERSED AND REMANDED.
All Judges concur.
[1] Officer Goodwin testified that he remembered that he had read the appellant his Miranda rights, because he did not believe that the appellant could read.
[2] Cf. Cleckler v. State, 570 So.2d 796 (Ala.Cr.App. 1990) (wherein this court held that an officer's comment to the defendant that the police found only one set of footprints was not so misleading as to warrant reversal; the statement was based on the fact that the evidence showed "the police found only one clearly identifiable print and some other smudged prints. The testimony at trial indicated that all the prints were caused by a shoe with the same pattern. Thus, it was not unreasonable for the investigating officers to conclude that the crime was perpetrated by a sole actor."). Cf. also Gilderv. State, 542 So.2d 1306, 1308 (Ala.Cr.App. 1988).
[3] In McCary v. State, a chief deputy told the defendant that his accomplice had been killed, although the official was well aware that the accomplice was not dead, the implication of the official's misrepresentation being that the defendant could be charged with the murder of the accomplice.