Rel: December 20, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

––––––––––––––––––––––––

### CR-2022-1280

––––––––––––––––––––––––

**Jimmy ONeal Spencer**

**v.**

**State of Alabama**

**Appeal from Marshall Circuit Court**
**(CC-18-465)**

McCOOL, Judge.

Jimmy ONeal Spencer was convicted of seven counts of capital murder for intentionally causing the deaths of Marie Kitchens Martin ("Martin"), Colton Ryan Lee ("Colton"), and Martha Dell Reliford ("Reliford"). The murders of Martin and Reliford were made capital

because the murders were committed by the defendant during a robbery in the first degree or an attempt thereof, in violation of § 13A-5-40(a)(2), Ala. Code 1975. The murder of Colton was made capital because the victim was less than 14 years of age, in violation of § 13A-5-40(a)(15), Ala. Code 1975. Additionally, the murders of Martin and Colton were also made capital because two or more persons were murdered by the defendant by one act or pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), Ala. Code 1975. Each of the murders were further made capital because they were committed while the defendant was under a sentence of life imprisonment. See § 13A-5-40(a)(6), Ala. Code 1975. The jury recommended by a vote of 12-0 that Spencer be sentenced to death, and the Marshall Circuit Court followed the jury's recommendation and imposed that sentence.

### Facts

On January 22, 2018, Spencer was paroled from a life sentence, which he was serving for his convictions of first-degree escape and third-degree burglary. (Supp. R. 1264.)[1] Testimony revealed that, following

---

[1]Citations to the court documents contained in the record on appeal will be indicated as "C. __." Additionally, we note that the record on appeal contains duplicate copies of the transcripts from the trial

Spencer's parole, Spencer had resided at the Jimmy Hale Mission, a halfway house, in Birmingham. Spencer subsequently left Birmingham and made his way to Marshall County. At some point, Spencer, Spencer's girlfriend, and Jeremy and Misty Buckelew lived together in a trailer. However, Spencer and his girlfriend later became homeless.

Amanda Patterson, Martin's granddaughter, testified that on the evening of July 12, 2018, she and Martin planned for Martin to pick up Patterson's son from Patterson's home at approximately 10:30 a.m. the following day. The next day, on July 13, 2018, Martin failed to show up to pick up Patterson's son and Patterson became concerned. After numerous failed attempts to reach Martin on her cellular telephone, Patterson drove to Martin's house during Patterson's lunch break. When Patterson arrived at Martin's house, she noticed that Martin's car was not at the house. Patterson "assumed [Martin] was out with family or something," and, thus, Patterson returned to work. (Supp. R. at 694.) However, when Patterson still had not heard from Martin by the time

proceedings in this case; however, because the supplemental record contains the correct pagination of the trial transcripts, this Court shall reference the transcripts from the trial proceedings in this case as "Supp. R. ___."

3

Patterson got off work at 3:00 p.m., Patterson called her father, Paul Young, to meet her at Martin's house because she "knew something was wrong." (Supp. R. 695.)

Patterson and Young met at Martin's house around 4:30 p.m. Martin's car was still not at her house. Patterson then noticed that the screen door to Martin's house was cracked. Patterson called Martin again, and Patterson heard Martin's cellular telephone ringing inside the house. She also heard Martin's dog barking and whining inside the house. Patterson used a key that she possessed to enter Martin's house. Patterson testified that the state of the house was unusual and not in the general condition that Martin kept the house, noting that the television was on, cabinet doors were open, and Martin's jewelry was spread out on her bed. Patterson then found Martin in the guest bedroom, lying face down on the floor with her hands tied behind her back. Patterson ran back outside to tell Young what she had observed.

Young, who was Martin's son-in-law, then entered the house. Young observed Martin lying face down on the floor with a cord wrapped around her arms, which were tied behind her back. According to Young, Martin's head was bloody and there was a "dog collar" around her neck.

4

(Supp. R. 736.) Young could also see a "good bit" of blood under Martin's head and body. (Supp. R. 736.) Young began looking for Colton and found him lying on the floor of Martin's bedroom. Colton was lying on his back with one of his legs in an "awkward position like it had been broken," and Colton's head was bloody and lying in a pool of blood. (Supp. R. 739.) Young went back outside with Patterson and waited on the police to arrive. After the police arrived, Young told an investigator that Reliford, Martin's neighbor who lived across the street, was "usually looking out the windows and stuff and sometimes even had a camera, and that [the police] might check with her." (Supp. R. 744.)

Officer Jonathan Harris with the Guntersville Police Department ("the GPD") was the first officer to arrive at Martin's house after a call was dispatched concerning the scene at Martin's house. He went inside the house and observed that Martin and Colton were deceased. Officer Harris returned outside and started a "crime scene lock," and investigators were called to the scene. (Supp. R. 757.) Lieutenant Ted Spooner, who had arrived at the scene at approximately the same time as Officer Harris, testified that he had followed Officer Harris inside Martin's residence. Lt. Spooner also observed Martin and Colton

deceased on the floors in separate bedrooms. Lt. Spooner also testified that the house "had been ransacked." (Supp. R. 778.) Lt. Spooner immediately issued a "be on the lookout" alert through the GPD with a description of Martin's vehicle. (Supp. R. 780.)

According to Captain John East, the chief investigator with the GPD, a search of Martin's house revealed a hammer and a hanger close to the body of Colton, both of which had blood on them. Colton had an apparent trauma to his head, and his hands were tied with a black cord consistent with what was missing from a [nearby] backpack." (Supp. R. 915.) In the bedroom where Martin's body was found, investigators found the room to be in "disarray," noting jewelry boxes "thrown across the bed" and an "open drawer to a chest and clothes pulled out of it." (Supp. R. 921.) Investigators also noted that the kitchen cabinet doors were left open, that there was a paper towel on the kitchen floor, and that a grocery bag had blood on the outside of the bag. When Martin's car was recovered and processed by investigators, investigators discovered a significant amount of cigarette ash on the front floorboards of the driver and passenger sides of the vehicle, as well as cellophane from a cigarette box. The cigarette evidence in the car seemed strange to investigators

6

because, according to the family or items found inside Martin's house, Martin did not smoke.

During the initial investigation at Martin's house, officers learned that Martin's neighbor, Reliford, who lived across the street from Martin, had not been seen in 10 days. Lt. Spooner walked to Reliford's house and walked toward the back door. When he "made it around the west corner" of Reliford's house, he "immediately smelled decomposition," as if someone had been deceased "for some period of time." (Supp. R. 787.) Lt. Spooner and another officer entered the house and discovered Reliford, deceased on the floor of the front bedroom, lying beside the bed. Lt. Spooner saw some type of "bodily fluid or substance" on the wall beside the bed near where Reliford was found. (Supp. R. 792.) According to Lt. Spooner, based on the state of Reliford's decomposing body, she appeared to have been deceased for several days.

Officer Joe Parrish, an investigator with the State Bureau of Investigation ("the SBI"), also testified that, when he observed the scene at Reliford's house, Reliford's body was lying beside a medical bed and there was "a lot of fluid by the bed." (Supp. R. 843.) He also testified that Reliford's body was in a "bloated condition" and that there were "a lot of

7

insects in the house." (Supp. R. 843.) Officer Parrish testified that Reliford's body appeared to be in an "advanced" state of decomposition (Supp. R. 850.) In another room in Reliford's house, officers found two trash bags full of clothing and shoes, as well as a piece of furniture that had been overturned. Other items found at the scene included a blue hat and a Camel cigarette.

At approximately 10:00 p.m. on the evening of July 13, 2018, Officer Jeff Hall with the GPD was patrolling the area near the crime scene and discovered Martin's car parked in the Publix grocery-store parking lot. Officer Hall notified his supervisor of the discovery and stayed with the car until another officer arrived. While Officer Hall canvassed the area in search of the keys to Martin's car, he discovered a bottle of OxiClean and a rag nearby. Officer Hall later obtained a photograph of Martin's car taken from surveillance footage from a nearby Texaco gas station, and he recognized Spencer as the person that was in Martin's car. Officer Hall knew Spencer from a previous interaction with him weeks before the murders.

Tony Johnson testified that he manages several local businesses in Guntersville for the owners, including Premium Spirits and Imports

("Premium Spirits") and the Texaco gas station on Highway 431. He explained that he had installed surveillance systems at Premium Spirits and the Texaco station, which continuously record at those businesses. Premium Spirits is located next door to the Publix where Martin's car was discovered. The Texaco gas station is also located nearby. Johnson testified that he was in charge of maintenance on the surveillance systems of the businesses. Johnson confirmed that there had been "many occasions" in the course of his employment with the businesses in which he had been able to "go back and review incidents that have happened in the past" and, during those instances, he found that the cameras "work in the manner in which they're intended." (Supp. R. 1009.) Officers with the GPD contacted Johnson and asked Johnson to determine whether he could see a vehicle matching the description of Martin's car in any of the video-surveillance footage taken at Premium Spirits on the evening of July 12, 2018. Johnson reviewed the surveillance footage, which revealed a vehicle matching the description provided to him by the GPD driving backward through the parking lot of Premium Spirits. He provided a copy of the surveillance footage taken from Premium Spirits, as well as

9

still-frame photographs taken from the video-surveillance footage to the GPD.

Johnson also reviewed video-surveillance footage from the Texaco gas station at the request of the GPD. In the Texaco surveillance footage, Johnson observed what appeared to be the same individual and vehicle that had been seen in the Premium Spirits surveillance footage. Johnson was able to find two or three instances of surveillance footage of the individual in the Texaco station from the evening of June 12, 2018, which Johnson turned over to the GPD. Although Johnson did not know the identity of the individual on the surveillance footage from the Texaco station, he recognized him as someone who frequently visited the Texaco station during the few weeks leading up to July 13, 2018, and with whom Johnson had spoken to before. The surveillance videos were admitted into evidence and played for the jury. (Supp. R. 1022.)

The following Sunday, July 15, 2018, Officer Harris heard other officers discussing possible suspects of the crime, and he recognized Spencer's name as a possible suspect. Officer Harris testified that he knew Spencer from Officer's Harris's time volunteering with a homeless ministry at his church. While reviewing a photograph that officers had

10

obtained from surveillance footage of someone driving Martin's car at a nearby business, Officer Harris identified Spencer as the person driving the car. Officer Harris was directed to find Spencer. Officer Harris later found Spencer walking between the Texaco station and the Wyndham Garden Inn in Guntersville. Spencer told Officer Harris that he was headed to "get some clothes at Ms. Reliford's house." (Supp. R. 765.) Following their conversation, Spencer voluntarily rode with Officer Harris to the police station.

Investigator Mike Turner with the GPD was also involved in the investigation and collection of evidence in this case. Among other items of evidence found, investigators found in a trash can under the sink in the kitchen of Martin's house a local newspaper, that had Reliford's name and address on it. According to Investigator Turner, after Spencer had been identified by officers and located on July 15, 2018, Spencer willingly agreed to go to the police station to talk to the officers. Investigator Turner testified that Spencer was not under arrest at that time. Investigator Turner stated that he spoke with Spencer "for a while" in his office and then went over Spencer's Miranda[2] rights with him before

---

[2]Miranda v. Arizona, 384 U.S. 436, 444 (1966).

11

speaking with him further. (Supp. R. 1059.) Investigator Turner testified that he read "each and every one" of Spencer's <u>Miranda</u> rights to him. (Supp. R. 1060.) Spencer told Investigator Turner that he was familiar with his <u>Miranda</u> rights. A copy of the <u>Miranda</u> waiver form that was signed by Spencer was admitted into evidence.

According to Investigator Turner, during his discussions with Spencer on July 15, 2018, Spencer initially claimed that an individual named Ferris Wooten, someone whom Spencer knew from the Jimmie Hale Mission in Birmingham, had given him a ride in a gray car. Then, Spencer claimed that Wooten wanted Spencer to drive because Wooten was drunk. After he was confronted with the video-surveillance footage from Premium Spirits, Spencer's story further evolved to state that he had "put … Wooten out, and then [Wooten] told him to go park the car on the other side of Publix," and that Wooten had instructed Spencer to put the keys to the car in the seat of the car. (Supp. R. 1066-67.) Spencer also claimed that he had been working at Lakeview Bait and Tackle ("Lakeview") and that he had been getting paid for his work in food and a pair of jeans that Spencer had with him. Spencer later amended his statement to say that both the food and jeans had been in the car with

Wooten when Spencer got in the car with him. Spencer eventually admitted to Investigator Turner that he had driven the car by himself for some period before parking it at the Publix store, and Spencer stated that he had reason to believe that the car may have been stolen. Investigator Turner testified that Spencer claimed that Wooten had told him that he had robbed a house but that Wooten had stated "that he didn't have to hurt nobody." (Supp. R. 1072.) Investigator Turner stated that, at the end of that conversation, Spencer was placed under arrest for receiving stolen property with relation to Martin's car.

Investigator Turner testified that on the following day, July 16, 2018, Spencer requested to speak with him. Before speaking with Spencer at that time, Investigator Turner again informed Spencer of his Miranda rights. Spencer executed another written Miranda waiver form, and a copy of that form dated July 16, 2018, at 12:30 p.m., was admitted into evidence. Agent Frank Langdon with the Federal Bureau of Investigation ("the FBI") and Detective Eric Farmer with the Albertville Police Department were also present during the interview. During the interview, Spencer indicated that he knew where Wooten had discarded Martin's purse that he had found in her car. The officers and Spencer

13

then traveled to the location where Spencer claimed the purse had been discarded, but nothing was found. While the officers were in the car with Spencer, Investigator Turner confronted Spencer about the fact that he kept changing his story. On the way back to the police station, Spencer told Investigator Turner that "he was tired" and that he "wanted his lawyer or one of [the officers] to go with him to the district attorney's office, and he would just tell [them] what happened." (Supp. R. 1079.)

According to Investigator Turner, when the officers and Spencer returned to the police station, Investigator Turner again reviewed each of Spencer's <u>Miranda</u> rights with him and Spencer signed a third <u>Miranda</u> waiver form, which was executed at approximately 4:22 p.m. on July 16, 2018. A copy of that <u>Miranda</u> waiver form was entered into evidence. Investigator Turner testified that at no point during the conversations that he and the other officers had with Spencer on July 15 or 16 did anyone threaten Spencer. Investigator Turner also claimed that, during each conversation that he had with Spencer, Spencer never appeared to be under the influence of any drugs, medicines, or alcohol and that Spencer appeared to understand what Investigator Turner was talking about and the nature of the investigators business with Spencer.

14

Following Spencer's execution of the third <u>Miranda</u> waiver form, Spencer gave an audio-recorded statement to Investigator Turner and Detective Farmer, in which Spencer admitted to killing Martin, Colton, and Reliford. A copy of the audio recording was admitted into evidence and played for the jury.

This Court reviewed the statement that was played for the jury. In his statement, Spencer explained that, before the murders, he had been living on the street and had been stealing food from the Publix store to be able to feed himself and his girlfriend. Spencer indicated that he had been to Reliford's house previously because Reliford was related to a friend of his, and Spencer and his friend would do some work for Reliford. Spencer and his girlfriend would pick up bandages and food at the store for Reliford and bring them to her. Spencer explained that he knew Reliford had enough money to at least pay rent for a couple of weeks and that, thus, he went to Reliford's house with a hatchet. Reliford let Spencer inside the house. When Reliford was sitting on the edge of her bed, Spencer told her he wanted the money that she had. When Reliford attempted to stand up from the bed, Spencer hit Reliford in the head with the wide part of a hatchet three times. Reliford fell to the floor. Spencer

15

testified that he also cut Reliford across the throat because he was worried that, if she was not dead, she would identify him later. According to Spencer, he grabbed off her bed Reliford's "pocketbook" that contained approximately $500-600. (Spencer's recorded statement, at 12:43.) Spencer admitted that he had overturned a loveseat in Reliford's house looking for a gun that Reliford had previously indicated that she had in the house because he thought that he could get money for the gun. Spencer indicated that he disposed of the hatchet in a bag in a garbage can at the Texaco station. Spencer stated that he took the money he stole from Reliford and went to rent a hotel room and bought cigarettes, beer, food, and $100 worth of "ICE." (Spencer's recorded statement, at 1:29:03.) According to Spencer, he had killed Reliford approximately two or three weeks before he gave his statement to police.

In the recorded statement played for the jury, Spencer continued to explain in his statement that he had seen Martin out in her yard and around her house. Spencer stated that when he ran out of money on Thursday, July 12, 2018, he went to Martin's house at approximately 8:30 p.m. Spencer got mail from a trash can and knocked on Martin's door in an attempt to convince Martin to open the door so he could get in her

16

house to get money. Spencer stated that when Martin opened the screen door to get the mail from Spencer, he sprayed Martin with a deodorant spray that he intended to burn her eyes. Spencer stated that he then pulled out a toy pistol because Martin started screaming the name of another person that Spencer believed to be inside the home. Spencer told Martin to lay down on the floor. Martin told Spencer that no one was there except her great-grandson. Spencer demanded that Martin tell Colton to come into the kitchen. Spencer claimed that he then made Martin and Colton go into the living room and sit on the couch. Spencer then made Martin go in the bedroom to get her purse, and they all returned to the living room. Martin told Spencer that she had only $13. Spencer made Martin give Spencer her credit cards. According to Spencer, he then tied Martin up with a phone-charger cord and tied Colton up with some earbuds. At some point, Colton asked to use the restroom and Spencer had to cut the earbuds off of Colton, which were left lying on the restroom floor. After Colton went to the restroom, Spencer tied Colton up again with a different cord on the living room floor.

Spencer stated that he made Martin go into her bedroom with him while Spencer searched for money and while Colton remained in the living room on the floor. Spencer stated that he found jewelry in a drawer in Martin's room and that he dumped it on the bed in an attempt to find valuable jewelry. Spencer then made Martin go back to the kitchen, where Spencer searched the kitchen cabinets for money. Spencer stated that he then took Martin into a different bedroom to go through drawers in that bedroom. While Martin was standing against the bed in that bedroom, Spencer placed some type of cord around Martin's neck to choke her. Spencer stated that, after Martin fell to the floor, he stabbed Martin in the neck and cut Martin's throat to make sure that she was dead. Spencer claimed that he was going to leave Colton, who was still in the living room, alone; however, he feared that Colton would later identify him.

Spencer claimed that at that point, he made Colton go into the other bedroom. Colton was facing away from Spencer, and Spencer hit Colton twice with a hammer. Colton was still standing, so Spencer continued to hit him about five or six more times with the claw end of the hammer until Colton eventually fell. Spencer claimed that he washed his hands

in the kitchen sink. He also stated that he went back in the bedroom and got a pair of blue jeans to change into because he had blood on his pants. Spencer found Martin's car keys and took Martin's car. Spencer parked the car at the Publix store, tried to wipe the car down to remove fingerprints, and threw the car keys out. He claimed that he slung the knife he used on Martin into the creek. Spencer further directed the officers to where he had disposed of Martin's purse, debit card, and other belongings. Spencer claimed that he was under the influence of "ICE" during the killings of Martin and Colton.

At the conclusion of Spencer's statement, Spencer confirmed to Investigator Turner that no one had coerced, threatened or promised him anything to speak to the officers. (Spencer's recorded statement, at 1:46:13.) Spencer acknowledged that, the first time he had spoken to officers, Spencer had indicated that he might want to talk to an attorney and that, at that time, the officers had ended the conversation and placed Spencer in the jail. Spencer admitted that, while he was in the jail, he approached the jailer two or three times and informed the jailer that he wanted to talk to the officers again. Spencer acknowledged that, at that point, the jailer brought him back to the jail and he agreed to speak to

19

the officers without an attorney present. Spencer indicated that the officers read Spencer his <u>Miranda</u> rights again before officers began the conversation that resulted in his recorded statement.

Following the playing of Spencer's statement for the jury, Investigator Turner further testified that, based on information provided by Spencer during his interview, he, Agent Langdon, and Det. Farmer took Spencer to look for some of the items that Spencer claimed to know the location of. According to Investigator Turner, Spencer directed them to Martin's "bank card," which was located in the hedge bushes behind the local Walmart store, as Spencer had described to the officers in his statement. (Supp. R. 1096). Investigator Turner also testified that Spencer's account of the murders and his actions following the murders, which Spencer had provided in his recorded statement to law enforcement, matched evidence discovered at the crime scenes, video-surveillance footage, and the state of the houses when the crimes were discovered and investigated by law enforcement.

Over the course of several days following the murders, Spencer requested to speak with Investigator Turner multiple times. Each time Investigator Turner obtained a written <u>Miranda</u> waiver form, which

Spencer signed. Based on information that officers obtained during those interviews, officers recovered items located behind a local Waffle House restaurant, which were relevant in the investigations of the murders of Reliford, Martin, and Colton, including a bag with Reliford's mail, a bottle of Axe body spray, a bottle of Aleve pain reliever, Reliford's cellular telephone that was broken, and Spencer's t-shirt that he had been wearing in the surveillance videos taken at the Texaco station.

Following the recovery of those items, on July 25, 2018, Spencer again reached out to Investigator Turner requesting to speak with him. During that discussion, which occurred after Spencer waived his Miranda rights again, Spencer explained to the officers that the Axe body spray was what he had used to spray in Martin's eyes and that the bottle of Aleve came from Reliford's house. Spencer also indicated that he would often go to the area behind the Waffle House to "hide and drink and do crystal meth." (Supp. R. 1158.) On August 7, 2018, and August 15, 2018, Spencer again requested to speak with Investigator Turner. During each of the interviews conducted by law enforcement, Spencer maintained his story and confession to the murders of Reliford, Martin, and Colton.

21

Dr. Valerie Green, a medical examiner with the Alabama Department of Forensic Sciences, testified that she performed an autopsy on each of the victims. Dr. Green detailed the severity of the injuries sustained by the victims, and autopsy photographs of each victim were admitted into evidence. She testified that Reliford's cause of death was blunt-force injuries of the head and neck. Dr. Green classified Martin's cause of death as "asphyxiation due to ligature strangulation and blunt force injuries of the neck." (Supp. R. 1215.) Dr. Green testified that Colton's cause of death was blunt-force injuries of the head.

## Standard of Review

This Court recently explained the following:

"Rule 45A, Ala. R. App. P., was amended on January 12, 2023, to state:

"'In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.'

"Before Rule 45A was amended, this Court was required to conduct plain-error review in all cases in which the death penalty had been imposed. Although Rule 45A now provides

22

that plain-error review is discretionary in such cases, this Court has explained that it will continue to conduct plain-error review in all cases in which the death penalty has been imposed. Iervolino v. State, [Ms. CR-21-0283, Aug. 18, 2023] ⸺ So. 3d ⸺, ⸺, (Ala. Crim. App. 2023). However, that does not mean that this Court will provide a detailed analysis, or even any analysis, of those claims that were not properly preserved for appellate review, as it historically did when plain-error review was mandatory. Id.

"The standard this Court employs in conducting plain-error review is well settled:

"'"'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not

23

establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."'

"Iervolino, ___ So. 3d at ___ (quoting DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018))."

Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024).

## Discussion

### I.

Spencer alleges that his death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution because, he says, he is "intellectually disabled" under Atkins v. Virginia, 536 U.S. 304, 321 (2002), and Ex parte Perkins, 851 So. 2d 453, 456 (Ala. 2002). (Spencer's brief at 42.) Specifically, Spencer argues that he has "substantially subaverage intellectual ability," that he displays

24

significant or substantial deficits in adaptive behavior, and that his intellectual disabilities manifested themselves before the age of 18. To the contrary, the State argues that Spencer failed to meet his burden to prove that he is intellectually disabled under <u>Atkins</u>.

Spencer called one witness to testify at his <u>Atkins</u> hearing. Dr. Randall Griffith, a clinical neuropsychologist, testified that he performed a psychological evaluation of Spencer on December 10, 2021, at the Kilby Correctional Facility. Dr. Griffith explained that he administered the Wechsler Adult Intelligence Scale, Fourth Edition, IQ test, which consists of 4 subcategories under IQ, and is made up of 10 separate subtests. Dr. Griffith's evaluation lasted approximately 75 minutes. Dr. Griffith testified that, during his evaluation, Spencer was "cooperative," that he spoke and answered questions about his background, and that he had a "reasonable mood" without indication of any "mood disturbances." (Supp. R. 178-79.) Dr. Griffith explained that he did not observe anything from Spencer that would suggest any severe mental illness, such as "responding to internal stimuli," "responding to voices," or paranoia, and that Spencer had "marginal insight" by having the ability to explain things about his background and his life and how those things affected

him. (Supp. R. 179.) However, Dr. Griffith stated, he was unsure whether Spencer had "full appreciation of all the meanings of why those things might have affected him." (Supp. R. 179.) The only "confounding factors" that Dr. Griffith thought "might" relate to Spencer's IQ was that Spencer has a history of some drug use, which Dr. Griffith claims "can affect a person's intellectual functioning." (Supp. R. 178.) Dr. Griffith testified that Spencer was generally oriented to where he was and who he was; however, Spencer did not know the date or aspects of time. Dr. Griffith testified that "[o]verall I thought [Spencer's] testing was somewhat inefficient" and that Spencer tended to make errors on tasks that required transcription of numbers and symbols. (Supp. R. 179.)

Additionally, Dr. Griffith acknowledged that the test was performed without Spencer's eyeglasses, although he did not believe Spencer's lack of his eyeglasses substantially affected his test performance. Dr. Griffith testified that it was "a little bit difficult to completely extrapolate and say this is a completely accurate picture of [Spencer's] performance," but, "given [Spencer's] background," he thought that the testing "seemed to be a fair representation." (Supp. R. 180.) Dr. Griffith also acknowledged that "the lowest test [Spencer]

performed on was the processing speed test" and that Spencer did have handcuffs on during the evaluation, which "might have slowed him down slightly." (Supp. R. 184.) However, Dr. Griffith testified, he considered the testing to be "generally accurate." (Supp. R. 184.)

In regard to Spencer's educational background, Dr. Griffith testified that Spencer informed him that the last grade he had completed was the eighth grade, that he had had special-education services because "he was identified as a slow learner," that he had not attended school regularly because he had to stay home and help his mother, and that he had repeated at least one grade. (Supp. R. 180.) Spencer informed Dr. Griffith that his work history included working with a logging crew and working at a sewing plant where he delivered materials from one location to another. Dr. Griffith also stated that his understanding was that Spencer had been in prison since he was 20 or 21 years old. Dr. Griffith testified that he determined Spencer's IQ to be 56.

On cross-examination, Dr. Griffith testified that he was instructed to perform an IQ test and that he did not perform any adaptive-functioning testing during his evaluation. He also stated that, although he did not say anything in his written report about the third requirement

27

under Atkins, i.e., the onset of intellectual and adaptive-functioning deficits before the age of 18, he thought that the educational history provided to him by Spencer "would be suggestive" of Spencer's having an early onset of such deficits. (Supp. R. 191.) He testified that the amount of time he had spent with Spencer was "sufficient" to administer the IQ test; however, he was concerned about the lack of time that he had spent with Spencer. (Supp. R. 193.) Dr. Griffith indicated that, although Spencer was determined to be in the intellectual-functioning range of someone with an IQ of 56, because Dr. Griffith did not assess the second and third criteria under Atkins, "a larger evaluation or more typical Atkins type evaluation" would be required for a full diagnosis. (Supp. R. 201.) He also acknowledged that it was "concerning" that he had to perform the evaluations while Spencer was still manacled. (Supp. R. 205.) Dr. Griffith also noted that, in evaluating Spencer, he did not review any of Spencer's mental-health or psychological history, including records from the Department of Corrections or Spencer's school records. Dr. Griffith testified that he did not have any information regarding Spencer's abilities, such as whether he could use a debit or credit card, a cellular telephone, or computers, whether he could provide housing for

28

himself, whether he could maintain friendships with others, or whether he could prepare food or clothe himself.

During the hearing, Dr. Griffith's report was admitted into evidence. Dr. Griffith's written report stated that Spencer's intellectual test results fell in the "extremely low range, representing an IQ score falling within the range of 53-61." (C. 349.) Dr. Griffith's report also concluded with the following statement:

> "Lastly, Mr. Spencer's test findings could represent Intellectual Disability, although a more substantive evaluation focusing on his adaptive functioning and review of historical records (if available) would be required to investigate the possibility of an Intellectual Disability diagnosis."

(C. 340.)

At the conclusion of the <u>Atkins</u> hearing, the trial court found that the defense had not meet its burden of proof to establish that Spencer was intellectually disabled.

The Alabama Supreme Court has held that

> "[i]ntellectual disability must be proven by a preponderance of the evidence, and the trial court's determination is entitled to deference on appeal. <u>Ex parte Lane</u>, 286 So. 3d 61, 66 (Ala. 2018)(citing <u>Ex parte Smith</u>, 213 So. 3d 313, 319 (Ala. 2010)). A trial judge exceeds his or her discretion when there is no evidence on which the judge could have rationally based his

29

or her decision regarding the defendant's intellectual disability. Ex parte Lane, 286 So. 3d at 66."

Carroll v. State, 300 So. 3d 59, 61 (2019). Additionally, the United States Supreme Court and the Alabama Supreme Court have recognized that "it is unconstitutional to impose a death sentence upon a defendant with an intellectual disability." Carroll, 300 So. 3d at 62 (citing Moore v. Texas, 581 U.S. 1 (2017), and Atkins v. Virginia, 536 U.S. 304 (2002)).

In Ex parte Perkins, the Alabama Supreme Court held that, in order for a defendant to be considered intellectually disabled, a defendant "must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior." 851 So. 2d at 456. "Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18.)" Id. The Alabama Supreme Court has recognized that that "[a]ll three factors must be met in order for a person to be classified as mentally retarded for the purposes of an Atkins claim."[3] Ex parte Smith, 213 So. 3d 313, 317 (Ala. 2010)(citing Smith v. State, 213 So. 3d 239, 248 (Ala. 2007)). "Implicit in the definition is that the subaverage

---

[3]Previous court decisions use the term "mentally retarded" to refer to a person that is intellectually disabled.

intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18." Smith, 213 So. 3d at 248.

In the present case, we find that the trial court did not abuse its discretion in finding that Spencer failed to meet his burden to prove that he was intellectually disabled and ineligible for the death penalty. Spencer, relying solely on Dr. Griffith's finding that he had a full-scale IQ score of 56, argues that his IQ score is "nearly three standard deviations below the mean for the general population" and that "the State did not present any evidence to refute [his] score." (Spencer's brief at 45-46.) We agree that a determination that Spencer's full-scale IQ score is 56 would suggest that he had a significant subaverage intellectual functioning. However, we note that evidence was also presented during the Atkins hearing that was sufficient to cause the reliability of Dr. Griffith's test results to be called into question.[4] Specifically, at the hearing, Dr. Griffith expressed his concern regarding the limited time

---

[4]We note that in the State's brief on appeal, the State also points to portions of Dr. Glen King's testimony during the penalty phase of Spencer's trial to further support its position that Spencer had failed to adequately prove that he was intellectually disabled.

constraints placed on his administration of Spencer's IQ test, which he admitted could have affected the accuracy of the test. He also acknowledged that the test was performed while Spencer was still in handcuffs and that Spencer did not have his eyeglasses during the test, which could also impact test results. Despite the admitted shortcomings in the administration of Spencer's IQ test, according to Dr. Griffith's report that was admitted into evidence, Dr. Griffith opined that the test findings were an "accurate representation" of the intellectual functioning of Spencer. (C. 338.)

Regardless, even assuming that Spencer's IQ does, in fact, put him in the range of having significantly subaverage intellectual functioning, Spencer failed to present sufficient evidence to prove the second and third requirements necessary to render him intellectually disabled under Atkins. At the hearing, Dr. Griffith acknowledged that any information he had regarding Spencer's adaptive functioning and whether Spencer's intellectual or adaptive deficits began before the age of 18 were based on Spencer's own self-reporting to Dr. Griffith during their interview. Dr. Griffith admittedly did not review any educational records or past medical records during his evaluation of Spencer. Most importantly, Dr.

32

Griffith testified at the hearing that he did not assess the second and third criteria under <u>Atkins</u> and that, thus, "a larger evaluation or more typical <u>Atkins</u> type evaluation" would be required for a full diagnosis. Likewise, in Dr. Griffith's written report, he concluded that, although Spencer's test findings "<u>could</u> represent Intellectual Disability," a "more substantive evaluation focusing on his adaptive functioning and review of historical records … would be required to investigate the possibility of an Intellectual Disability diagnosis." (C. 340.) Accordingly, because Spencer failed to present evidence establishing that he met the second and third criteria that are required for a defendant to be classified as intellectually disabled under <u>Atkins</u>, the trial court did not err in finding that Spencer was not intellectually disabled. See <u>Ex parte Smith</u>, 213 So. 3d at 317.

## II.

Next, Spencer claims that the trial court erred in failing to hold a hearing on his motion to suppress his statements to law enforcement. In Spencer's brief, he alleges that he first made a request for a suppression hearing in his motion to suppress and that, during a pretrial conference, he "reiterated his request" for the court to hold a "'a separate hearing on

the motion to suppress, once we have the results of [Spencer's] IQ test.'" (Spencer's brief at 21.) He claims that, "[w]hile the trial court initially indicated that it would hold a hearing on [Spencer's] motion to suppress," "the court ultimately denied the motion without holding a suppression hearing, based solely on the court's own in camera review of the statements." (Spencer's brief at 22.)

In a pretrial motion, Spencer moved to suppress the statements that he made to law enforcement. In his motion to suppress, he argued:

"1. The statements were obtained in violation of [Spencer's] privilege against self-incrimination and the right to counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendment[s] to the United States Constitution.

"2. The statements constitute the fruit of an unlawful arrest and violation of [Spencer's] right to privacy as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

"3. All statements, whether written or oral, were obtained from [Spencer] in violation of the rights afforded by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, in that all these statements were made without counsel present, and without adequate warning of [Spencer's] rights, at the time during which they were undergoing great mental strain and physical strain.

"4. The statements were made prior to [Spencer's] presentment before a committing Judge and after a lapse of an unreasonable time from time of the arrest.

34

"5. Further grounds for the suppression of this statement will be developed at the time of the hearing on the motion."

(C. 30.)

On December 7, 2021, the trial court held a pretrial-conference hearing, at which Spencer was scheduled to appear via Zoom, a video-conferencing application. Spencer was not initially present on Zoom. While the court waited on Spencer to appear on the video, the court did not hear substantive arguments, but the court and counsel for both the State and the defense discussed whether there were any matters or motions that the parties could agree on before they started the hearing. After discussion on several other pretrial matters, the following occurred:

"[Prosecutor]: … Is there any other motions that we could possibly –

"[Defense Counsel]: We could discuss the motion to suppress the defendant's statements, Your Honor. We had certainly hoped that could have been resolved long before now. We did finally get the psychological evaluation completed and a report on that, which of course gave rise to some issues over the defendant's IQ.

"We have made arrangements to have him IQ tested. As you know, we had some difficulty getting the doctor in the prison to meet with him.

"THE COURT: Has that still not happened?

35

"[Defense Counsel]: It has happened. He's scheduled to get that done on Friday. Of course, the issue becomes we don't know how long it's going to take him to complete that, and we don't know how long it's going to take him to get a report back to us. So we really can't move forward on that motion until we have that.

"THE COURT: Okay. That issue will remain open, then."

(Supp. R. 59-60.) The trial court further questioned the attorneys regarding the amount of statements and the length of the recorded statements in question. The attorneys explained that there were "seven or eight" statements that "took place at separate times with different people present." (Supp. R. 60-61.) The following then occurred:

"[Defense Counsel:] Judge, the defense would not object to you listening to those prior to hearing.

"THE COURT: Prior to trial?

"[Defense Counsel:] Or the trial.

"THE COURT: Talking about a lot of time there.

"[Defense Counsel:] Yes, sir. It would save time as far as in-court time in front of the jury not having to break to let the Court listen to that."

(Supp. R. 61.) After more discussion regarding the length of time it might take the court to listen to all the recordings of Spencer's statements, the following transpired:

"THE COURT: On the motion to suppress the Court will do an in camera hearing, meaning I'll have to listen to them individually before the trial starts and stop/start or whatever. And are these all audiotapes or are some of them videotapes?

"[Prosecutor:] One video, and the rest are audio.

"[Prosecutor 2:] And, I don't know if I understand what [defense counsel] is saying, Judge. I have no idea what the results of the evaluation will be, but there may be some sort of modification to his motion to suppress, is what I think I've heard [defense counsel] say, that may also necessitate another proceeding. I don't know.

"[Defense Counsel:] I think we would need to have a separate hearing on the motion to suppress, Your Honor, once we have the results of the IQ test.

"THE COURT: So you believe we're going to need to revisit the issue after the completion of his IQ test?

"[Defense Counsel:] Yes, Your Honor"

(Supp. R. 63-64.) After more discussion, the court concluded:

"THE COURT: All right. Very well. We'll have to get that done. We can't speculate what that's going to be until the psychological IQ test is finished."

(Supp. R. 64.)

After Spencer joined the hearing via Zoom, the court held a substantive hearing on other matters. At the conclusion of the hearing, the court stated the following:

"THE COURT: … I also am on notice now that I'm going to have to go through an extensive amount of audiotapes, so I'll have to go through all those tapes before I can give an opinion as to whether they're admissible or not.

"We still have the open question that may require a second hearing on pretrial regarding this expert interviewing – going to interview [Spencer] on Friday, starting Friday. I don't know if he's going to be finished by then or not. Then I have to have get [sic] that report."

(Supp. R. 98)(emphasis added).

On December 16, 2021, the trial court issued a written order noting that the "Motion to Suppress Statements is held open" and that all audio and video recordings, or written statements, were to be turned over to the court to review for the defense's motion to suppress. (C. 202.)

On August 31, 2022, the trial court entered an order, stating that the court had reviewed all of Spencer's statements and found that all of Spencer's statements given to law-enforcement officers were admissible. (C. 218.)

During trial, the only instance in which Spencer's counsel brought up the suppression matter was when the State sought to introduce State's Exhibit 81, which was a Miranda waiver form executed by Spencer before giving one of his statements, during Investigator Turner's testimony. The following transpired:

"[Prosecutor:] I'll offer State's Exhibit 81, Your Honor.

"THE COURT: Any objection to 81?

"[Defense Counsel:] Your Honor, the defense would reassert the motions and arguments previously asserted at the suppression hearing, pretrial.

"THE COURT: All right. So noted. 81 is admitted."

(Supp. R. 1083.)

Rule 104(c), Ala. R. Evid., states:

"In criminal cases, hearings on the admissibility of confessions or evidence alleged to have been obtained unlawfully shall be conducted out of the hearing and presence of the jury. Hearings on other preliminary matters shall be conducted out of the hearing and presence of the jury when the interests of justice require."

Therefore, as this Court recently explained, "[t]he current law in Alabama is that if a defendant files a motion to suppress a statement, he does not have to request that a hearing be held outside the presence of the jury because such a hearing is mandatory." Ketchum v. State, [Ms. CR-2023-0611, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024). See also Lewis v. State, 27 So. 3d 600, 602 n.1 (Ala. Crim. App. 2008)(noting that the adoption of Rule 104, Ala. R. Evid., made mandatory a hearing on a motion to suppress outside the presence of the jury).

In the present case, Spencer filed a pretrial motion to suppress, raising several allegations of a violation of his constitutional rights. (C. 30.) On December 7, 2021, the trial court purported to hold a hearing on all pretrial motions. During that pretrial hearing, the record is clear that both parties agreed to have the trial court listen in camera to the recordings of Spencer's confessions and statements to law enforcement, due to the "extensive amount" of recordings that the court was going to have to review before making its decision on the admissibility of the statements. "'A party may not predicate an argument for reversal on "invited error," that is, "error into which he has led or lulled the trial court."'" Smith v. State, 795 So. 2d 788, 813 (Ala. Crim. App. 2000)(quoting Atkins v. Lee, 603 So. 2d 937 (Ala. 1992)). "We have applied the invited-error rule to capital cases. Smith, 795 So. 2d at 813. "An invited error is waived, unless it rises to the level of plain error." Ex parte Bankhead, 585 So. 2d 112, 126 (Ala. 1991). Consequently, because the underlying basis for this argument concerns a stipulation by the parties, Spencer's argument lacks merit.

Further, to the extent that Spencer is arguing that the court failed to hold an additional hearing on the admission of the statements relating

40

to additional grounds or new issues that could have possibly been revealed following Spencer's mental evaluation, Spencer is also not entitled to relief. "Rule 104(c), Ala. R. Evid., imposes no duty on a judge to hold a hearing outside the presence of the jury when no motion to suppress or challenge to the evidence has been made." <u>Ketchum</u>, ___ So. 3d at ___. At the December 7, 2021, hearing, Spencer's defense counsel and the court acknowledged that the possible need for a second hearing was dependent on the results of the mental evaluation. As the trial court noted, neither the parties nor the court could speculate as to the findings of that evaluation. The record indicates that, following the mental evaluation, defense counsel did not file any additional motions requesting that the court suppress Spencer's statements on other grounds related to the mental evaluation, nor did counsel request an additional hearing on the matters of suppression already presented to the court in the original motion to suppress. During the trial, Spencer objected to the admission of his <u>Miranda</u> waiver form, and, apparently, his statement to law enforcement, by merely stating that the defense would "reassert the motions and arguments previously asserted at the suppression hearing, pretrial." (Supp. R. 1083.) Therefore, based on the record before this

41

Court, we conclude that the trial court did not commit reversible error by failing to hold any further hearings on the suppression of Spencer's statements.

## III.

Spencer also claims that the trial court erred in admitting his inculpatory statements to law enforcement because, he says, "the totality of the circumstances surrounding [Spencer's] interrogation – including both [Spencer's] personal characteristics and the conduct of the interrogating officers – establishes that the waiver of rights and the admitted statements were not freely and voluntarily given, but rather were the result of a coercive interrogation that overbore [Spencer's] will." (Spencer's brief at 28.) Spencer insists that his "intellectual deficits and personal characteristics" rendered both his waiver of rights and his subsequent statements involuntary. (Spencer's brief at 29.) He also claims that the circumstances of his interrogations, including the length of the interrogations over the course of two days and the alleged conduct of the officers after Spencer allegedly invoked his constitutional rights, establish that his statements were a product of coercion.

First, the record reflects that, although Spencer provided eight statements to law enforcement over the course of several weeks, only one of those statements was offered by the State and admitted into evidence at trial. (State's Exhibit 82; Supp. R. 1085.) In his brief, the majority of Spencer's argument and citations to the record challenging the admission of his statements to law enforcement relate to Spencer's first and second statements that were given to law enforcement. Not only are these two statements not included in the record on appeal, but the record reveals that those statements were never presented by the State or admitted into evidence during Spencer's trial. Therefore, the remaining seven statements, aside from the one statement given by Spencer on July 16, 2018, and any challenges related to those statements cannot be considered by this Court. See Morrow v. State, 928 So. 2d 315, 321 n.5 (Ala. Crim. App. 2004)("This Court is bound by the record on appeal and cannot consider facts not contained in the record."). Thus, any challenge to the admission of the statements that were not admitted into evidence is moot.

Additionally, to the extent that Spencer challenges the trial court's admission of Spencer's recorded statement that he gave to law

enforcement on July 16, 2018, see State's Exhibit 82, wherein Spencer confessed to the murders of Reliford, Martin, and Colton, Spencer is also not entitled to relief.

In Ex parte Jackson, 836 So. 2d 979 (Ala. 2002), the Alabama Supreme Court stated:

> "'"In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court."' Kennedy v. State, 640 So. 2d 22, 26 (Ala. Crim. App. 1993), quoting Bradley v. State, 494 So. 2d 750, 760–61 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). The trial court's ruling on a motion to suppress will not be disturbed unless it is palpably contrary to the great weight of the evidence. See Dixon v. State, 588 So. 2d 903 (Ala. 1991); Parker v. State, 587 So.2d 1072, 1088 (Ala. Crim. App. 1991); Rutledge v. State, 680 So. 2d 997, 1002 (Ala. Crim. App. 1996); and Maples v. State, 758 So. 2d 1 (Ala. Crim. App. 1999), aff'd, 758 So. 2d 81 (Ala. 1999), cert. denied, 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000).
>
> "Extrajudicial statements are prima facie involuntary and inadmissible; the duty rests on the trial court to determine whether the statement is voluntary, and unless it appears that it is voluntary it should not be admitted. See Farrior v. State, 728 So. 2d 691 (Ala. Crim. App. 1998). The burden is on the State to show voluntariness and a Miranda predicate before such a statement can be admitted into evidence. See Lewis v. State, 535 So. 2d 228 (Ala. Crim. App. 1988). 'Whether a waiver is voluntary, knowing, and intelligent depends on the particular facts and underlying circumstances of each case, including the background, experience, and conduct of the accused—i.e., the totality of the

circumstances.' Click v. State, 695 So. 2d 209, 218 (Ala. Crim. App. 1996). The voluntariness of an inculpatory statement remains undetermined until the trial court has examined the totality of the circumstances surrounding the statement. See Ex parte Hill, 557 So. 2d 838, 841 (Ala.1989).

"The trial court's finding that a statement was voluntary need only be supported by a preponderance of the evidence. Dixon[,] supra. The test for the voluntariness of an extrajudicial confession or an inculpatory statement is whether, in light of all the surrounding circumstances, the statement was free from inducement, threat, or promise, either expressed or implied, that would have produced in the mind of the accused any fear of harm or hope of favor. Ex parte Price, 725 So. 2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999)."

836 So. 2d at 982-82.

Additionally, this Court has further explained:

"'To determine if a defendant's will has been overborne, [a court] must assess "the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure"; "[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures." Jackson [v. State], 562 So. 2d [1373,] 1380–81 [(Ala. Crim. App. 1990)] (citations omitted).'

"McLeod [v. State], 718 So. 2d [727,] at 730 [(Ala. 1998)]. The Alabama Supreme Court has explained:

"'[An] [a]ccused's intelligence, character and situation at the time of the confession of the crime

45

charged are important considerations in determining whether the confession was voluntary, but the fact that accused was of tender age or weak intellect will not alone render the confession inadmissible in evidence as involuntary. State v. Ashdown, 5 Utah 2d 59, 296 P.2d 726 [(1956)]. Evidence tending to show a defendant's weak mentality, feeblemindedness, and mental stress does not affect the admissibility of the confessions, but rather is a matter that bears on the weight, credibility and effect to be given the confessions by the jury. State v. Stewart, 238 La. 1036, 117 So. 2d 583 [(1960)].'

"Elrod v. State, 281 Ala. 331, 334, 202 So. 2d 539, 542 (1967); see also Jones v. State, 43 So. 3d 1258, 1273 (Ala. Crim. App. 2007) (same). Thus, '[w]hile an accused's intelligence and literacy are important factors, ... weak intellect or illiteracy alone will not render a confession inadmissible.' Hobbs v. State, 401 So. 2d 276, 282 (Ala. Crim. App. 1981) (citations omitted); see also Hodges v. State, 926 So. 2d 1060, 1073 (Ala. Crim. App. 2005) (same); cf. Colorado v. Connelly, 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that mental defects alone are insufficient to establish that a confession was involuntary under the Due Process Clause). Further, 'trickery or deception by the police ... have not been considered sufficiently coercive, standing alone, to render a confession or incriminating statement involuntary.' Ex parte Jackson, 836 So. 2d 979, 983 (Ala. 2002)(quoting Ex parte Hill, 557 So. 2d 838, 841 (Ala. 1989)). See also United States v. Velasquez, 885 F.2d 1076, 1088 (3d Cir. 1989)(false statement that co-actor had made statement against defendant and was being set free did not render confession involuntary)."

Townes v. State, 253 So. 3d 447, 498 (Ala. Crim. App. 2015).

Considering the totality of the circumstances in this case, the State presented sufficient evidence to establish that Spencer's statement was voluntarily given. Spencer claims in his brief that his intellectual deficits, such as his low IQ and his failure to complete past the eighth grade, render his statement involuntary. While the court may consider such factors in determining the validity of his waiver, those factors alone are not determinative of the voluntariness of the waiver of his rights. See Dobyne v. State, 672 So. 2d 1319, 1337 (Ala. Crim. App. 1994)(holding that having a low IQ, by itself, does not render a waiver of Miranda rights ineffective, but is merely one factor affecting the validity of a waiver of rights and the voluntariness of a confession); see also Colorado v. Connelly, 479 U.S. 157, 163-65 (1986) ("[T]he fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary.").  Thus, despite Spencer's purportedly having a low IQ, a low IQ alone does not render his confession involuntary. Additionally, we note that, as this Court previously determined in Section I of this opinion, the trial court properly determined that Spencer had failed to prove that he was intellectually disabled.

Spencer also claims that the voluntariness of his statement was affected because, at the time he was brought in for questioning, he "told investigators that he had not slept for days because he was high on methamphetamines." (Spencer's brief at 30.) However, even if Spencer's contention regarding his mental state at the time he was initially brought in for questioning is taken as true, the evidence presented indicates that Spencer was initially brought in for questioning on July 15, 2018, a day before when Spencer provided the statement in question to law enforcement. On July 16, 2018, the day that the statement in question occurred, Spencer had spent the prior night in jail and then he requested to speak with the officers the following day. While there was no evidence regarding Spencer's ability to sleep the night before his statement was given, Investigator Turner testified that, at the time Spencer gave this statement, Spencer did not appear to be under the influence of drugs, alcohol, or medicines. Immediately before Spencer's confession, Investigator Turner read each of Spencer's <u>Miranda</u> rights to him, just as he had done the day prior. Spencer, once again, indicated that he was aware of his <u>Miranda</u> rights and executed the <u>Miranda</u> waiver form, waiving his rights. A copy of the <u>Miranda</u> waiver form was entered into

evidence. Notably, each of the instances of coercion that Spencer proffers in his brief involve conversations that allegedly took place during Spencer's first two statements given to police on July 15, 2018, which were not admitted into evidence and, thus, are not before this Court for consideration. There is no indication in the record that Spencer's recorded statement was the product of any threats, inducements, promises, or coercion. In fact, in his recorded statement, Spencer affirmatively confirms that he was not threatened or promised anything in exchange for his statement. Therefore, after reviewing the totality of the circumstances in this case, we conclude that the trial court did not abuse its discretion in finding that Spencer's confession was voluntarily given. Accordingly, this issue is without merit and does not entitle Spencer to any relief.

## IV.

Next, Spencer argues that the trial court erroneously denied his motion for a change of venue. Before trial, Spencer filed a motion for a change of venue alleging that trying the case in Marshall County would violate his right to a fair trial by an impartial jury guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. In

his motion, he claimed that all the major newspapers, radio stations, and television stations in Marshall County and the surrounding counties had described "the acts with which the defendant [was] charged." (C. 155.) He also claimed that the newspapers "included significant portions of documentary and hearsay evidence relative to the defendant," which "severely prejudiced" Spencer. (C. 155.)

The trial court held a pretrial hearing to address Spencer's motion to change venue. At the hearing, Steve Raby, with a communication company that does statistical research on behalf of its clients, testified as an expert in statistics. Raby testified that, after reviewing the media coverage involving Spencer's case, the extent of the news coverage was "in the upper 80 percentile." (Supp. R. 69.) He noted that his company considered statements made, such as "this is a gruesome situation," and comments that had been made by the Attorney General, such as "[t]his is a career criminal" or "[s]ome of our investigators here say this is one of the worst cases they've seen in history." (Supp. R. 69.) Raby testified that his company performed a survey of registered voters in Marshall County that are eligible for participation in the jury pool. According to Raby, of the people polled, "[o]ver 70 percent" had a "substantial recall of the

events alleged in the indictment" against Spencer. (Supp. R. 71-72.) He also claimed that "73 percent" felt that Spencer was guilty of murder, "27 percent" were unsure, and 0 said that Spencer was "not guilty." (Supp. R. 71-72.)

The State argued that Spencer had failed to meet his burden to establish that a fair and impartial trial could not be had if the trial were to be held in Marshall County. After accepting arguments from both the State and defense counsel, the trial court took the matter under advisement. The trial court ultimately denied Spencer's motion for a change of venue in a written order issued on December 16, 2021.

This Court has explained:

> "'"When requesting a change of venue, '[t]he burden of proof is on the defendant to "show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried."'" Jackson v. State, 791 So. 2d 979, 995 (Ala. Crim. App. 2000) (quoting Hardy v. State, 804 So. 2d 247, 293 (Ala. Crim. App. 1999), aff'd, 804 So. 2d 298 (Ala. 2000), quoting in turn Rule 10.1(b), Ala. R. Crim. P.).
>
> > "'"[T]he determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any

51

prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial."'

"'Nelson v. State, 440 So. 2d 1130, 1132 (Ala. Crim. App. 1983). Therefore, "[a] trial court's ruling on a motion for a change of venue is reviewed for an abuse of discretion." Woodward v. State, 123 So. 3d 989, 1049 (Ala. Crim. App. 2011).

"'"In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated 'actual prejudice' against him on the part of the jurors; 2) when there is 'presumed prejudice' resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected."

"'Hunt v. State, 642 So. 2d 999, 1042-43 (Ala. Crim. App. 1993), aff'd, 642 So. 2d 1060 (Ala. 1994).

"'....

"'"Actual prejudice exists when one or more jurors indicated before trial that they believed the defendant was guilty, and they could not set aside their opinions and decide the case based on the evidence presented at trial." Hosch v. State, 155 So. 3d 1048, 1118 (Ala. Crim. App. 2013). "The standard of fairness does not require jurors to be

totally ignorant of the facts and issues involved." Ex parte Grayson, 479 So. 2d 76, 80 (Ala. 1985). "'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'" Id. (quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).

"'....

"'Prejudice is presumed "'when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.'" Hunt[ v. State], 642 So. 2d [999,] 1043 [(Ala. Crim. App. 1993)] (emphasis omitted) (quoting Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir. 1985)). "'To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.'" Jones v. State, 43 So. 3d 1258, 1267 (Ala. Crim. App. 2007) (quoting United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir. 1990)). "In order to show community saturation, the appellant must show more than the fact 'that a case generates even widespread publicity.'" Oryang v. State, 642 So. 2d 979, 983 (Ala. Crim. App. 1993) (quoting Thompson v. State, 581 So. 2d 1216, 1233 (Ala. Crim. App. 1991)). Only when "the pretrial publicity has so 'pervasively saturated' the community as to make the 'court proceedings nothing more than a "hollow formality"'" will presumed prejudice be found to exist. Oryang, 642 So. 2d at 983 (quoting Hart v. State, 612 So. 2d 520, 526-27 (Ala. Crim. App.), aff'd, 612 So. 2d 536 (Ala. 1992), quoting in turn,

53

Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)). "This require[s] a showing that a feeling of deep and bitter prejudice exists in [the county] as a result of the publicity." Ex parte Fowler, 574 So. 2d 745, 747 (Ala. 1990).

"'In determining whether presumed prejudice exists, we look at the totality of the circumstances, including the size and characteristics of the community where the offense occurred; the content of the media coverage; the timing of the media coverage in relation to the trial; the extent of the media coverage; and the media interference with the trial or its influence on the verdict. See, e.g., Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), and Luong v. State, 199 So. 3d 139, 146 (Ala. 2014). "[T]he 'presumptive prejudice' standard is '"rarely"' applicable, and is reserved for only "extreme situations."'" Whitehead v. State, 777 So. 2d 781, 801 (Ala. Crim. App. 1999), aff'd, 777 So. 2d 854 (Ala. 2000) (quoting Hunt, 642 So. 2d at 1043, quoting in turn, Coleman, 778 F.2d at 1537).'

"Floyd v. State, 289 So. 3d 337, 372-74 (Ala. Crim. App. 2017).

"'[T]he Alabama Supreme Court in Luong v. State, 199 So. 3d 139 (Ala. 2014), recognized the difficulty of establishing that a motion for a change of venue is warranted based on a claim of prejudicial pretrial publicity.' Thompson v. State, 310 So. 3d 850, 865 (Ala. Crim. App. 2018). In Luong, the defendant was convicted of killing his four children by throwing them off a bridge. The Alabama Supreme Court, in declining to find that the extensive media coverage of the case warranted a change of venue, stated:

> > "'"If, in this age of instant, mass communication, we were to automatically disqualify persons who have heard about an alleged crime from serving as a juror, the inevitable result would be that truly heinous or notorious acts will go unpunished. The law does not prohibit the informed citizen from participating in the affairs of justice. In prominent cases of national concern, we cannot allow widespread publicity concerning these matters to paralyze our system."'

> "Luong, 199 So. 3d at 150 (quoting Calley v. Callaway, 519 F.2d 184, 210 (5th Cir. 1975))."

Iervolino v. State, [Ms. CR-21-0283, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023).

Spencer contends on appeal that the trial court erred in denying his motion to change venue because "there was extensive pretrial publicity about this case," including widespread news stories about "the graphic details of the crime and the victims" and "facts relating to [Spencer's] prior criminal history." (Spencer's brief at 55.) He also relies on the fact that the Alabama Attorney General publicly referred to him as a "career criminal" and "an example of a badly broken parole system." Id.

In the present case, the record indicates that there were some potential jurors who indicated during voir dire that they had heard of the case before trial, and some of those potential jurors admitted that they

had preconceived ideas of Spencer's guilt. However, there is nothing in the record to suggest that any of the jurors that actually served on the jury during Spencer's trial had a belief before trial that Spencer was guilty, or that they could not set aside their opinions and decide the case based on the evidence presented at trial. Therefore, the record is devoid of any actual prejudice that existed that would mandate a change in venue.

Further, viewing the totality of the circumstances in this case, we also cannot say that Spencer met his burden to show that the media coverage of his case was sufficient to show presumed prejudice. On appeal, Spencer contends that Marshall County has approximately 99,423 residents based on the United States Census Bureau's population estimates as of July 1, 2022; however, there was no information provided by Spencer regarding the characteristics of the community where the offenses occurred or how that related to the pretrial publicity of his case. At the pretrial hearing on the matter, Spencer relied on Raby's testimony that the poll Raby had conducted revealed that approximately 70% of the people he surveyed in Marshall County had heard of the case in the media and that, of those 70% of people who had heard of the case, 73%

thought that Spencer was guilty. We note that the percentages offered by Raby, however, included individuals who were only 18 years old and, thus, were unable to serve on a jury. Spencer failed to make any argument concerning the timing of the media coverage of the case.

Additionally, Spencer failed to provide documentary evidence of any of the media coverage surrounding his case or provide specific statements that were given in the media reports. Raby testified at the hearing that the news reports claimed that "it was a gruesome situation" and that reports were made that the Attorney General had commented on the case. (Supp. R. 69.) Spencer also made allegations in his brief that "graphic details of the crime were shared." However, those allegations alone do not provide sufficient evidence to show that the media saturation was such that he could not receive a fair trial. "Bare allegations, without more, are insufficient to prove community saturation." Hubbard v. State, 324 So. 3d 855, 863 (Ala. Crim. App. 2019)(citing Lee v. State, 898 So. 3d 790, 967 (Ala. Crim. App. 2001))(holding that evidence was insufficient to show media saturation when the defendant did not attach copies of the newspaper articles or transcripts of the broadcasts that he referenced in his motion to change

of venue). Considering all of these factors, prejudice was not presumed in the instant case, and the trial court did not abuse its discretion by denying Spencer's motion for a change of venue. See Hunt, 642 So. 2d at 1042-43.

## V.

Spencer alleges that there were numerous instances of prosecutorial misconduct that denied him a right to a fair trial and, thus, require reversal of his convictions and sentence. Because Spencer did not raise these claims in the trial court, his claims of prosecutorial conduct will be reviewed for plain error only. See Rule 45A, Ala. R. App. P.; see also Mitchell v. State, 913 So. 2d 501, 505 (Ala. Crim. App. 2005)("To preserve an issue for appellate review, the issue must be timely raised and specifically presented to the trial court and an adverse ruling obtained." (emphasis omitted)).

This Court has held:

> "'"While the failure to object will not bar our review of [an appellant's] claims of prosecutorial misconduct, it will weigh against any claim of prejudice that [an appellant] makes on appeal '"'because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'"' Ferguson v. State, 814 So. 2d 925, 945 (Ala. Crim. App. 2000), aff'd, 814 So.

2d 970 (Ala. 2001), cert. denied, 535 U.S. 907, 122 S. Ct. 1208, 152 L. Ed. 2d 145 (2002), quoting <u>Kuenzel v. State</u>, 577 So. 2d 474, 489 (Ala. Crim. App. 1990), aff'd, 577 So. 2d 531 (Ala. 1991)."

"'<u>Calhoun v. State</u>, 932 So. 2d 923, 962 (Ala. Crim. App. 2005).

"'Also, many of the instances involve challenges to arguments made by the prosecutor in his opening or closing statements.

"'"'In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.' <u>Smith v. State</u>, 698 So. 2d 189, 202–03 (Ala. Crim. App. 1996), aff'd, 698 So. 2d 219 (Ala. 1997), cert. denied, 522 U.S. 957, 118 S. Ct. 385, 139 L. Ed. 2d 300 (1997) (citations omitted); <u>Bush v. State</u>, 695 So. 2d 70, 131 (Ala. Crim. App. 1995), aff'd, 695 So. 2d 138 (Ala. 1997), cert. denied, 522 U.S. 969, 118 S. Ct. 418, 139 L. Ed. 2d 320 (1997) (citations omitted). 'The relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."' <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986), quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. <u>Duren v. State</u>, 590 So. 2d 360, 364 (Ala. Crim. App. 1990), aff'd, 590 So. 2d 369 (Ala. 1991), cert. denied, 503 U.S. 974, 112 S. Ct. 1594, 118 L. Ed. 2d 310 (1992). 'Prosecutorial misconduct is subject

to a harmless error analysis.' <u>Bush v. State</u>, 695 So. 2d at 131 (citations omitted); <u>Smith v. State</u>, 698 So. 2d at 203 (citations omitted)."

"'<u>Simmons v. State</u>, 797 So. 2d 1134, 1161–62 (Ala. Crim. App. 1999) (opinion on return to remand). We must view the challenged arguments in the context of the entire trial and not in the abstract. <u>See</u> <u>Duren v. State</u>, 590 So. 2d 360 (Ala. Crim. App. 1990); <u>Whitlow v. State</u>, 509 So. 2d 252 (Ala. Crim. App. 1987). It is proper for a prosecutor to argue any legitimate inference that may be drawn from the evidence. <u>See</u> <u>Snyder v. State</u>, 893 So. 2d 488 (Ala. Crim. App. 2003).'"

<u>Phillips v. State</u>, 287 So. 3d 1083, 1115-16 (Ala. Crim. App. 2015)(quoting <u>Belisle v. State</u>, 11 So. 3d 256, 302-03 (Ala. Crim. App. 2007)). We address each alleged instance of misconduct in turn.

A.

Spencer claims that "during the State's guilt-phase closing argument, the prosecutor improperly compared this case to other cases." (Spencer's brief at 69.) Spencer claims in his brief that a prosecutor "'cannot imply that he or his office had already made the judgment that this case, above most other cases, warrants the death penalty.'" (Spencer's brief at 70)(citing <u>Arthur v. State</u>, 575 So. 2d 1165, 1185 (Ala. Crim. App. 1990)).

During the prosecutor's closing arguments during the guilt-phase of Spencer's trial, the prosecutor thanked the jury for their attentiveness

during the eight-day trial and recognized that the jurors put their own lives "on hold" to do their "civic duty" to serve on a jury. (Supp. R. 1315.) The prosecutor continued, stating:

> "So it's important that you know that we recognize that, and with that out of the way, I'll try to proceed with some brief remarks. Quite frankly, this has been one of the hardest cases I have ever tried to sit down and plan out remarks for the jury. Because quite frankly, folks, I submit to you the evidence in this case has been so overwhelming, I almost hesitate to have to get up and repeat some of it.

> "But nonetheless, I want to comment on a few things I don't think have quite been touched on enough and point out some things that I really want to underscore that you've heard in the past few days.

> "You folks have sat here, I guess we took evidence for four days, took testimony and evidence for four days. And y'all have heard some of the most incredible, disgusting, offensive and disturbing testimony that I would argue has ever been heard in a courtroom in Marshall County."

(Supp. R. 1315-16)(emphasis added). The prosecutor continued his argument and began to review the evidence that had been presented to the jury.

Spencer argues that the emphasized portion of the prosecutor's closing argument above was an improper comparison to other cases and an improper implication to the jury that his office has made a judgment that this case warrants the death penalty. The cases cited by Spencer

involve cases wherein the Court found plain error when the prosecutor had commented that "the State of Alabama, the law enforcement agencies and everyone agreed that this was a death penalty case," see Guthrie v. State, 616 So. 2d 914, 931-32 (Ala. Crim. App. 1993), and in which this Court noted that "the prosecutor … cannot imply to the jury that he or his office has already made the judgment that this case, above most other capital cases, warrants the death penalty." Id. Contrary to Spencer's contention, the prosecutor's comments above did not involve any statement regarding the sentence that Spencer should receive, much less a statement that he should receive the death penalty.

In the present case, the prosecutor's statements were a comment on the nature of the evidence presented and the prosecutor's assessment that the evidence was "overwhelming." In Price v. State, 725 So. 2d 1003, 1028 (Ala. Crim. App. 1997), this Court explained:

> "'"'Certainly the State's attorney should be permitted to comment on the character of the evidence presented by the State and its strength. That certain evidence is uncontradicted tends to show its strength. Our statute does not abrogate the right of the State's counsel to comment on legitimate inferences in this regard.'"' Taylor v. State, 279 Ala. 390, 391, 185 So. 2d 414, 415, (1966), quoting Welch v. State, 263 Ala. 57, 81 So.2d 901 (1955)."

In <u>Hunt v. State</u>, 659 So. 2d 933, 940-41 (Ala. Crim. App. 1994), this Court rejected the defendant's argument that a prosecutor's comment was reversible error, where the prosecutor stated in guilt-phase closing arguments that the State's evidence was "overwhelming" and that, "if this isn't capital murder, then there has never been capital murder in Walker County." Therefore, Spencer is not entitled to relief on this claim.

B.

Spencer also alleges that the prosecutor improperly "involved arguments based on sympathy for the victims … on at least three occasions." (Spencer's brief at 70.)

First, Spencer contends that the prosecutor made improper comments related to Colton, stating:

> "A child, seven years old, who had his whole life ahead of him before it was taken from him. A little boy who was visiting his great-grandmother where of all places he should feel safe and happy and protected. That little boy won't ever know what it's like to grow up, go to high school, maybe go to college, get married and have a family of his own. He won't ever know."

(Supp. R. 1318.)

Second, he contends that, while showing the jury a photograph of Reliford, the prosecutor improperly stated:

63

"State's Exhibit 3, Martha Reliford. Martha Reliford, that's what she looked like. You can see Ms. Reliford there sick, in firm, had cancer, and she was blind. Legally blind. She's there on crutches and she's got her sunglasses on, and that's the way I want you to remember Martha Reliford. I think that's how her family would want you to remember her as opposed to the body you saw laying on the floor that had decomposed over a period of a week to two weeks laying there in the living room, and certainly the autopsy photographs."

(Supp. R. 1317.)

Lastly, Spencer argues that the prosecutor improperly commented on the testimony given by Patterson, Martin's granddaughter, "who testified that her son often spent the night at Ms. Martin's house but was not there the night of the crime." (Spencer's brief at 71.) That portion of the record indicates that the prosecutor stated the following:

"Let's talk a little bit about some of the testimony and move on. Amanda Patterson testified first, and she told ya'll about Ms. Martin. … And she told you on July 12th that she was going to take her son Brandon over to stay also at Ms. Martin's house because Colton was over there, and he liked to play with Colton, and she was going to take Colton [sic] over there so he could spend the night, too. And don't you know that woman has thanked God many days that she got to feeling bad and decided not to take her son over there that night?"

(Supp. R. 1319-20)(emphasis added). We note that, in his brief, Spencer merely included, and complained about, the emphasized portion of the prosecutor's comment seen above, in which the prosecutor reviewed

64

Patterson's testimony. Additionally, although included only as a parenthetical citation to one of the other comments by the prosecutor, Spencer apparently takes issue with two other isolated comments by the prosecutor, wherein the prosecutor stated: 1) "They all deserved to live, especially Colton. And none of them deserved to die, certainly to die in the manner in which they did," and 2) "It's time for justice to be done." (Supp. R. 1347; 1349); see also (Spencer's brief at 71).

Contrary to Spencer's assertions, these comments do not constitute reversible error. The prosecutor's comments were legitimate inferences that could have been drawn from the evidence and did not so infect the trial with unfairness that Spencer was denied due process. See Phillips, 287 So. 3d at 1115-16. See also Scott v. State, 163 So. 3d 389, 454 (Ala. Crim. App. 2012)(holding that the prosecutor's statements during a guilt-phase closing argument wherein the prosecutor speculated about potential life experiences that a six-year-old victim would no longer get to have was not error); Woodward v. State, 123 So. 3d 989, 1078 (Ala. Crim. App. 2011)("A prosecutor may argue every legitimate inference from the evidence 'and may examine, collate, [sift] and treat the evidence

in his own way.'" (citation omitted)). Therefore, Spencer is not entitled to relief on this claim.

C.

Spencer further argues that, during his questioning of Investigator Turner, the prosecutor "repeatedly injected his own descriptions and characterizations of video surveillance evidence taken at the Texaco gas station." (Spencer's brief at 72-73.) Spencer complains about three questions in particular, which were asked by the prosecutor during his questioning of Investigator Turner. Each of the questions arose during the following portion of the prosecutor's direct examination of Investigator Turner:

> "[Prosecutor:] Now of course you talked with Spencer, and certainly a large part of the statement consisted of going over the details of the homicide again. But I'll ask you, we saw the – some of the State's exhibits that were admitted into evidence and viewed yesterday had to do with some surveillance videos that were taken from the Texaco station the evening that Ms. Martin and Colton were killed. Did you talk to Mr. Spencer about those in order to gain some idea of what he was doing, what had taken place and what he was doing and what he had in each of those clips from the Texaco that we saw?
>
> "[Turner:] Yes, sir.
>
> "[Prosecutor:] I think the first one we saw, Mike, consisted of Mr. Spencer apparently or appearing to walk to the Texaco

across the road clad in a T-shirt and carrying a bag. Did you talk with him about that?

"[Turner:] Yes, sir.

"[Prosecutor:] Did you ask him or did he tell you what was in the bag that he had at that time?

"[Turner:] Yes, sir.

"[Prosecutor:] What did he tell you?

"[Turner:] I don't remember if he said the spray was in the bag at that particular time or maybe the spray and two beers. I don't remember.

"[Prosecutor:] Did he tell you where he had gotten the stuff that was in the bag?

"[Turner:] Yes, sir.

"[Prosecutor:] Where was that?

"[Turner:] Publix.

"[Prosecutor:] Now, if you'll recall, when we look at the videos in sequence after that, Mr. Spencer returns to the Texaco probably 9 or 10 minutes later no longer wearing the T-shirt that he had on, wearing a tank top and he doesn't have anything in his hands at that time. Did you speak with him about that or talk about that, as well?

"[Turner:] Yes, sir. [Spencer] said it was hot, he took his T-shirt off and the bag and put it in some bushes behind the Waffle House and then walked back to the Texaco.

"[Prosecutor:] Now Mike, I wanted to ask you in regards to the manner in which Mr. Spencer was dressed in the first clip

> where he's seen walking with the bag to Texaco, <u>did you have</u>
> <u>occasion later</u> – and I'll get into it later, but did you have
> occasion <u>to find or see what you believe to be the T-shirt that</u>
> <u>he had on in that first segment of video</u>?
>
> [Turner:] Yes, sir."

(Supp. R. 1122-1124)(emphasis added). Spencer alleges that the emphasized portions of the prosecutor's questioning, quoted above, improperly "'induced the jury to trust the Government's judgment rather than its own view of the evidence.'" (Spencer's brief at 73)(citing <u>United States v. Young</u>, 470 U.S. 1, 18-19 (1985)).

We initially note that the United States Supreme Court's decision in <u>United States v. Young</u>, which is the only legal authority cited by Spencer in support of the instant claim, is not dispositive of the present issue and does not offer support to Spencer's argument. In <u>Young</u>, defense counsel made comments during its closing arguments that questioned the prosecutor's integrity and alleged that the prosecutor did not believe the Government's case. <u>Id.</u> at 3-6. In response, during the prosecutor's rebuttal argument, the prosecutor stated that his opinion was that the respondent was guilty of fraud. <u>Id.</u> The United States Supreme Court stated:

"The concerns underlying our reactions against improper prosecutorial arguments to the jury are implicated here, but not to the extent that we conclude that the jury's deliberations were compromised. The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. See Berger v. United States, 295 U.S. [78,] at 88–89, [(1935)]"

470 U.S. at 18-19. However, the United States Supreme Court ultimately found that, because there was no suggestion that the prosecutor's statement of his belief was based on information outside the evidence presented at trial and given the overwhelming evidence of the respondent's guilt presented at trial, any lingering doubt that the prosecutor's comment "unfairly prejudiced the jury's deliberations or exploited the Government's prestige in the eyes of the jury" was eliminated. Id. at 19.

"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly

improper acts in the abstract." <u>Bankhead v. State</u>, 585 So. 2d 97, 106 (Ala. Crim. App. 1989). "The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weigh against his claim of prejudice." <u>Ex parte Boyd</u>, 715 So. 2d 852, 855 (Ala. 1998).

In the present case, the prosecutor's questions to Investigator Turner were made after the videos in questions had been admitted into evidence and played for the jury. Investigator Turner had already testified that he had seen the videos in question during his investigation. Reviewing all the questions made by the prosecutor, especially when weighing Spencer's failure to object against his claim of prejudice, we hold that the questions posed by the prosecutor did not so infect the trial with unfairness that Spencer was denied due process. <u>See</u> <u>Phillips</u>, 287 So. 3d at 1115-16.

## VI.

Spencer also claims that the trial court invaded the province of the jury by commenting on evidence and testimony in violation of federal and state law by, he says, becoming an "advocate for the prosecution by communicating to the jury his view" of certain evidence. (Spencer's brief

at 77.) There are two comments made by the trial court that Spencer now challenges. Because Spencer did not object to the trial court's statements at the trial level, this claim will be reviewed for plain error only. See Rule 45A, Ala. R. App. P.

The first comment made by the trial court that Spencer now challenges occurred during the trial, immediately before the State played Spencer's recorded statement for the jury, wherein the trial court gave the following warning to individuals in the courtroom:

> "THE COURT: There's going to be some very graphic detail about this. So there may be some people that may get upset in the courtroom. I'm just letting you know you might want to step out of the room for a while. But there will be some pretty graphic details going forward. There's already been some. Some of you are already upset, so if you think you might ought to go outside and get your composure and stay outside until the DAs or somebody sends for you, I'm just giving you a warning."

(Supp. R. 1088.) In his brief, Spencer alleges that, by making this statement, the trial judge "became an advocate for the prosecution by communicating to the jury his view that [Spencer's] own words were 'graphic,' likely to 'upset' people in the courtroom, and even worth of leaving the courtroom." (Spencer's brief at 77.) We disagree.

In <u>McCovery v. State</u>, 365 So. 2d 358, 362 (Ala. Crim. App. 1978), this Court held that "[r]emarks by the trial judge may be open to criticism, but they are not error unless they may have affected the result of the trial." Additionally, this Court has also recognized that "[t]here is no ironclad rule by which the prejudicial character of the improper conduct and comments of a trial judge can be ascertained in all cases, most depending on the issues, parties, and the general circumstances of each particular case." <u>Oglen v. State</u>, 440 So. 2d 1172, 1175-76 (Ala. Crim. App. 1983).

In the instant case, the comment in question was made by the trial judge to everyone in the courtroom, not just to the jury, and was clearly made as a warning regarding the nature of the evidence that was about to be presented in an effort to allow for individuals in the courtroom to exit, if necessary. The trial judge's comment did not suggest that he was partial in any way to either the prosecution or the defense, nor did the comment speak to an ultimate issue in Spencer's case. Merely stating that there would be "graphic details" discussed that could be upsetting to some did not render the trial judge's comments partial and did not constitute conduct that strays from neutrality. Further, considering the

totality of the circumstances in the present case, we do not find that the trial court's comments affected the outcome of the trial. See McCovery, 365 So. 2d at 362. Therefore, we cannot conclude that the trial court's warning to the individuals in the courtroom about the nature of the evidence that was about to be presented denied Spencer a fair trial.

Additionally, Spencer alleges that the trial judge "improperly bolstered the credibility and expertise of the police officers and other witnesses presented by the State during the guilt-phase." (Spencer's brief at 75.) Before closing arguments by the parties, the trial judge made several statements to the jury. The judge acknowledged the attentiveness and cooperation of the jury and explained that the court was now going to move to the next part of the trial process, which was "closing arguments by the lawyers," wherein the lawyers would present arguments to the jury about what "their version of what the case [was] about, or what the case has not been about." (Supp. R. 1311.) The court then informed the jury of the following:

> "THE COURT: … You should remember that the arguments of the lawyers is not evidence itself. The evidence came in through the witness stand, right, and through the exhibits that were marked and I said they were in evidence. That's what's in evidence. What I said was in evidence, what was sworn that was said on the witness stand. Anything else that

happened somewhere else or outside of that is not in evidence. Anything I excluded was not in evidence.

"And the lawyers are given broad discretion in Alabama and in my courtroom, especially, if they believe – different versions of the facts, if everyone agreed on everything, you would not be sitting here today. So that's why a lot of cases settle, because people finally come to a conclusion that, here's what we need to do. But in a case of this nature it will go to the jury, and the jury has to go ahead and make the final decisions about what to do.

"So in this sort of case you find the facts. You're going to be the judges of what the true facts are, and I'm the judge of the law and procedure and how to move the case along. The attorneys have done an excellent job in the case. You've gotten to see some of the most experienced lawyers in North Alabama here. They've done a really good job, and so have all the officers that have testified, a lot of experience. A lot of experienced, different people have testified, doctors, different folks. It's been some really interesting testimony, been presented in very interesting ways from some very experienced lawyers, and these lawyers are going to have a chance to argue to you, not argue with you but to you, as to their version. Then I'm going to give you some jury charges, and that will take a while. Luckily we've already met with the lawyers."

(Supp. R. 1311-12)(emphasis added). The trial judge then continued explaining the other stages of the trial process that were to follow.

Spencer complains only about the emphasized portion of the court's comment above. However, "[t]he trial judge's statement to the jury must be viewed within the context of the entire charge." McCovery, 365 So. 2d

74

at 362. "'[I]solated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial.'" Id. (citing United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir. 1976)).

Reading the judge's comment in the context of the court's entire charge in this case, there is no indication that the court meant his statement to bolster the State's case or the defendant's case. The trial judge's statement also did not appear to be an intentional comment on the evidence that had been presented, nor was the judge speaking to the issues presented at Spencer's trial. To the contrary, the record indicates that the court was merely explaining the trial process to the jury and, in doing so, commented on how the trial had been handled up until that point by all the witnesses and attorneys involved. Additionally, immediately before the statement to which Spencer now challenges, the judge had explained to the jury that the arguments of counsel were not to be considered evidence, and the judge also explained to the jury that the jury would be the finders of fact in this case. Considering the entirety of the trial judge's statement to the jury and the context with which the statement was made, there is nothing in the record to suggest that the statement affected the result of Spencer's trial, and, therefore, we find no

75

error in the trial judge's comment to the jury. See McCovery, 365 So. 2d at 362.

## VII.

Spencer further claims that the jury was incorrectly instructed by the trial court that its penalty-phase verdict was merely a recommendation. Specifically, he alleges that the court erred by telling the jury that it would come back to "deal with the next phase, which will be recommending life without parole or death." (Supp. R. 1429.) He claims that the court's erroneous statement "misled the jury as to its role in the sentencing process in a way that allow[ed] the jury to feel less responsible than it should for the sentencing decision." (Spencer's brief at 84)(citing Darden v. Wainwright, 477 U.S. 168, 183 n.15 (1986)). Spencer raised no objections to the trial court's jury instructions, and, thus, we review this claim for plain error only.

Immediately after the jury returned their verdict of guilty for each of the counts of capital murder and the court acknowledged the guilty verdicts, the court instructed the jury about what would happen next in the trial proceedings. Because the allegedly erroneous statement "must be viewed within the context of the entire charge," McCovery, 365 So. 2d

at 362, we set forth a complete recitation of the trial court's jury
instruction that Spencer now challenges for the first time on appeal:

> "THE COURT: Would you hand the verdict form to the bailiff.
> Thank you.
>
> "Ladies and gentlemen, thank you. You've worked so
> hard up to this point. The Court finds that the verdicts are all
> in proper form and they've all been properly signed in Counts
> One through Seven. The defendant has been found guilty on
> all counts.
>
> "The next – there is another part of the trial that we
> have to do. It's called the sentencing phase, where the jury
> must vote for life imprisonment or death on these cases. There
> are a couple of expert witnesses that are being lined up, but
> one of them cannot be here in the morning. The other
> testimony can be given.
>
> "<u>What I'm going to do is you're going to come back to
> deal with the next phase, which will be recommending life
> without parole or death</u>. I'll have to give you some special
> instructions on that before you start your deliberations. And
> I'm going to give you some special instructions, how you'll look
> at it. You're going to hear from some expert witnesses about
> the defendant, what should be done and so forth. I'm not going
> to tell you who those are right now. I can't remember the
> names. But it's some testimony by experts from both the
> defense and the State that you'll have to hear and consider.
> You will then get some more short instructions from me, and
> you'll go back and deliberate and you'll return another verdict,
> and that verdict will be whether the defendant should receive
> a sentence of life without parole or death. I'm not stressing
> one over the other. It's what y'all have to vote on. Y'all
> understand?
>
> "....

"We'll start Friday morning bright and early at 9:00. It will take a few hours to go through this testimony on both sides. You'll hear argument again on both sides, sort of a closing argument. They're allowed to do opening and closing arguments. And then you'll go back there and vote for life without parole or death. Y'all have to reach that decision. You understand?"

(Supp. R. 1429-31)(emphasis added). The trial court then explained more procedures to the jury and cautioned them that they must not speak to anyone about the case or allow themselves to be exposed to any information about the case until they return for the sentencing phase. Then, the trial court again stated: "I'm going to let you separate for the night, but you have to come back together again and make that decision. And like today, you'll bring back a verdict and I'll check it, then at that point you'll be discharged." (Supp. R. 1432.)

"'"A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case." Pressley v. State, 770 So. 2d 115, 139 (Ala. Crim. App. 1999), aff'd, 770 So. 2d 143 (Ala. 2000). A "jury charge must be construed as a whole and the language must be construed reasonably." Ingram v. State, 779 So. 2d 1225, 1258 (Ala. Crim. App. 1999), aff'd, 779 So. 2d 1283 (Ala. 2000). "'Hypercriticism should not be indulged in construing charges of the court ...; nor fanciful theories based on the vagaries of the imagination advanced in the construction of the court's charge.'" Pressley, 770 So. 2d at 139 (quoting Addington v. State, 16 Ala. App. 10, 19, 74 So. 846 (1916)). "[W]e must evaluate instructions like a

78

reasonable juror may have interpreted them." <u>Ingram</u>, 779 So. 2d at 1258. A court's charge "must be given a reasonable -- not a strained -- construction," <u>Williams v. State</u>, 710 So. 2d 1276, 1305 (Ala. Crim. App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), and "'must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'" <u>Self v. State</u>, 620 So. 2d 110, 113 (Ala. Crim. App. 1992) (quoting <u>Porter v. State</u>, 520 So. 2d 235, 237 (Ala. Crim. App. 1987)). "When reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them." <u>Johnson v. State</u>, 820 So. 2d 842, 874 (Ala. Crim. App. 2000), aff'd, 820 So. 2d 883 (Ala. 2001). Moreover, plain error in jury instructions "'occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.'" <u>Williams</u>, 710 So. 2d at 1306 (quoting <u>United States v. Chandler</u>, 996 F.2d 1073, 1085 (11th Cir. 1993)).'"

<u>Iervolino</u>, ___ So. 3d at ___ (quoting <u>Floyd v. State</u>, 289 So. 3d 337, 439 (Ala. Crim. App. 2017)).

Reviewing the instruction as a whole, we cannot say that there was a reasonable likelihood that the jury applied the challenged instruction in an improper manner. In 2017, the Alabama Legislature amended Alabama's capital-sentencing scheme, which was codified at §§ 13A-5-45 through 13A-5-47, Ala. Code 1975, to remove the option for judicial override in capital sentencing and, thus, require the jury to return a verdict of life imprisonment without the possibility of parole or a verdict of death in cases where the defendant had been convicted of capital

murder. Because the offenses in this case occurred after the new capital-sentencing scheme became effective, the newly amended capital-sentencing scheme applied in Spencer's case. However, under the facts of this particular case, we cannot say that the trial court's use of the word "recommending" in one portion of its instruction to the jury amounted to plain error.

The statement in question was made to the jury as the court was preparing the jury for dismissal for the day, which was immediately following the return of the jury's guilt-phase verdicts. The court was clearly trying to convey to the jury what the expectations were while the court was in recess and to prepare the jury for what it should expect from capital-trial process when the jury returned to court for the penalty phase. Within the same instruction, merely a few sentences after the statement that Spencer now challenges, the court correctly informed the jury that they would "return another verdict, and that verdict will be whether the defendant should receive a sentence of life without parole or death." (Supp. R. 1430.) At least three more times during the same dismissal instructions, the court explained to the jury that the jury would be responsible for "reach[ing]" or "mak[ing]" the decision regarding the

sentence that Spencer would receive and that the jury would have to "reach a verdict" on whether Spencer would receive a life sentence without the possibility of parole or the death penalty. Additionally, our review of the instructions given to the jury during the penalty phase of Spencer's trial indicate that the trial court properly informed the jury of their role in sentencing. Interpreting the instruction in question as a whole and as a reasonable juror would interpret the jury charge, we cannot say that there was a reasonable likelihood that the court's statement was applied by the jury in an improper manner. See Iervolino, ___ So. 3d at ___.

## VIII.

Spencer also raised several other claims on appeal, which are listed in his brief on appeal as Issues V, VI, VII, X, XI, XII, XIV, XV, XVI, and XVII. Spencer did not raise any of those claims below, so we review them for plain error only. This Court has thoroughly considered the arguments that Spencer has raised in support of those claims, the authorities he has cited, and the applicable parts of the record. Having done so, we are convinced that no plain error occurred with respect to those claims, and we do not find it necessary to provide analyses for them. In addition to

reviewing those claims, this Court has painstakingly reviewed the entire record for any instances of plain error that Spencer may have overlooked, and we have found no such error.

## IX.

Finally, pursuant to § 13A-5-53(a), Ala. Code 1975, this Court must review the propriety of Spencer's death sentence.

Section 13A-5-53 provides, in pertinent part:

"(a) In any case in which the death penalty is imposed, in addition to reviewing the case for any error involving the conviction, the Alabama Court of Criminal Appeals, subject to review by the Alabama Supreme Court, shall also review the propriety of the death sentence. This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case. If the court determines that an error adversely affecting the rights of the defendant was made in the sentence proceedings or that one or more of the trial court's findings concerning aggravating and mitigating circumstances were not supported by the evidence, it shall remand the case for new proceedings to the extent necessary to correct the error or errors. If the appellate court finds that no error adversely affecting the rights of the defendant was made in the sentence proceedings and that the trial court's findings concerning aggravating and mitigating circumstances were supported by the evidence, it shall proceed to review the propriety of the decision that death was the proper sentence.

"(b) In determining whether death was the proper sentence in the case the Alabama Court of Criminal Appeals, subject to review by the Alabama Supreme Court, shall determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

"(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"(c) The Court of Criminal Appeals shall explicitly address each of the three questions specified in subsection (b) of this section in every case it reviews in which a sentence of death has been imposed."

In <u>Iervolino</u>, this Court explained:

"Section 13A-5-53(a) requires this Court to determine 'whether any error adversely affecting the rights of the defendant was made in the sentence proceedings.' In effect, this Court is required by § 13A-5-53(a) to review the penalty phase of the trial for plain error. It is unclear whether the amendment to Rule 45A making plain-error review discretionary with this Court supersedes the mandatory plain-error review required by § 13A-5-53(a). However, it is not necessary for us to make that determination because, as explained earlier in this opinion, this Court chooses to exercise its discretion and to review the entire record for plain

83

error in all cases in which the death penalty has been imposed."

___ So. 3d at ___. Like the Court in <u>Iervolino</u>, we have reviewed the record in the instance case, and we find that no error adversely affected Spencer's rights in the penalty phase of his trial.

Additionally, as this Court further explained in <u>Iervolino</u>,

"Section 13A-5-53(a) also requires this Court to determine 'whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence.' When the legislature removed the final sentencing decision from the trial court and placed it in the hands of the jury by Act No. 2017-131, Ala. Acts 2017, it amended § 13A-5-47, Ala. Code 1975, to remove subsection (d), which required the trial court to make specific findings of fact regarding the existence or nonexistence of each aggravating circumstance in § 13A-5-49, Ala. Code 1975, each mitigating circumstance in § 13A-5-51, Ala. Code 1975, and any additional mitigating circumstances offered by the defendant pursuant to § 13A-5-52, Ala. Code 1975. Now, § 13A-5-47(b), Ala. Code 1975, requires the trial court to make specific findings of fact regarding the existence or nonexistence of aggravating circumstances and mitigating circumstances only in cases in which jury sentencing is waived…. In addition, Alabama's capital-sentencing statutes do not require the jury to render verdicts on the mitigating circumstances it found to exist and the jury did not return special verdicts regarding mitigating circumstances."

___ So. 3d at ___.

In the present case, like in <u>Iervolino</u>, jury sentencing was not waived, and, thus, the trial court was not required to make specific

84

findings of fact regarding aggravating circumstances and mitigating circumstances. "[B]ecause we do not know which mitigating circumstances, if any, the jury found to exist, this Court cannot determine whether those circumstances were supported by the evidence" in the instant case. See id. at ___. By virtue of its guilt-phase verdicts, the jury did render a unanimous finding of four aggravating circumstances: 1) that the capital offense was committed by a person under a sentence of imprisonment, see § 13A-5-49(1), Ala Code 1975; 2) that the capital offense was committed while the defendant was engaged in the commission of a robbery, see §13A-5-49(4); 3) that Spencer "intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct," see § 13A-5-49(9); and 4) that the capital offense was committed when the victim was less than 14 years of age, see § 13A5-49(11). Those aggravating circumstances are supported by the record.

Lastly, pursuant to § 13A-5-53(a), this Court must determine "whether death was the proper sentence in this case." Section 13A-5-53(b) provides three questions that this Court must address in determining whether death was the proper sentence. First, as required by § 13A-5-

53(b)(1), this Court must determine "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." This Court has thoroughly reviewed the entire record in this case, and we conclude that Spencer's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Next, Section 13A-5-53(b)(2) provides that this Court shall determine "[w]hether an independent weighing of aggravating and mitigating circumstances at the appellate level indicates death was the proper sentence." During the penalty-phase instructions, the trial court pointed out several mitigating circumstances that the court had recognized from the evidence that was presented during the penalty phase that the jury might consider. However, the jury did not render verdicts regarding mitigating circumstances. Because the trial court is no longer required to make specific findings of fact regarding the existence or nonexistence of aggravating circumstances and mitigating circumstances, and because Alabama law does not require the jury to render verdicts regarding mitigating circumstances, "it is impossible for this Court to perform this part of our mandatory review of the death sentence in this case." Iervolino, ___ So. 3d at ___.

Lastly, § 13A-5-53(b)(3) provides that this Court shall determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Spencer was convicted of two counts of murder made capital because the murders were committed during the course of a robbery, one count of murder made capital because the victim was under the age of 14, one count of murder made capital because the murders were committed pursuant to one scheme or course of conduct, and three counts of murder made capital because the murders were committed while the defendant was under a sentence of life imprisonment. Spencer's sentence of death is not excessive or disproportionate to the sentence imposed in similar cases. See Dearman v. State, [Ms. CR-18-0060, Mar. 24, 2023] ___ So. 3d ___ (Ala. Crim. App. 2023)(affirming death sentence for intentional murders committed during a burglary and pursuant to one scheme or course of conduct); Petersen v. State, 326 So. 3d 535 (Ala. Crim. App. 2019) (affirming death sentence for intentional murders committed during a burglary and pursuant to one scheme or course of conduct); Keaton v. State, 375 So. 3d 44 (Ala. Crim. App. 2021)(affirming death sentence for intentional murders that were deemed heinous, atrocious, or

cruel and involved victims who were less than 14 years of age); and

<u>Callen v. State</u>, 284 So. 3d 177 (Ala. Crim. App. 2017)(affirming death sentence for intentional murders that were committed during the course of committing arson, that were committed pursuant to one scheme or course of conduct, and that involved a victim who was less than 14 years of age).

Accordingly, we conclude that death was the proper sentence in this case.

## Conclusion

For the foregoing reasons, we affirm Spencer's seven capital-murder convictions and his resulting sentence of death.

AFFIRMED.

Windom, P.J., and Cole and Minor, JJ., concur. Kellum, J., concurs in the result.